**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2792/2793

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Norwest Corporation, | * | Appeal from the United States District |
| | * | Court for the District of Minnesota. |
| Appellant; | * | |
| | * | |
| Arthur Andersen & Co., | * | |
| | * | |
| Intervenor-Appellant. | * | |

_____

Submitted: March 10, 1997
Filed: June 26, 1997

_____

Before WOLLMAN and BEAM, Circuit Judges, and LAUGHREY,[1] District Judge.

_____

BEAM, Circuit Judge.

In the course of an audit of Norwest Corporation, the Internal Revenue Service sought to enforce a designated summons directing Norwest to produce tax preparation software licensed to it by Arthur Andersen & Co., as well as related documents and

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

data.  Norwest and Andersen objected to the summons, claiming that the material was not within the scope of the IRS's authority, and that in any event it was not relevant to the audit.  After a hearing, the magistrate judge[2] issued an order enforcing the summons.  The district court,[3] adopting most of the findings and conclusions of the magistrate judge, affirmed the order.  Norwest and Andersen appeal, and we affirm.

## I.    BACKGROUND

Norwest is a large bank holding corporation that has more than 300 subsidiaries in the financial services industry.  Norwest files consolidated corporate federal income tax returns for all of its subsidiaries.  Since at least 1983, Norwest has used tax preparation software in preparing its tax returns.  In 1990, Norwest entered into a three-year licensing agreement with Andersen for use of Andersen's copyrighted "Tax Director" tax preparation software.  Norwest first used Tax Director in preparing its 1990 returns, and used the program again for its 1991 returns.

### A.    The Tax Director Program

Tax Director is a group of related programs developed by Andersen that a corporation can use to calculate federal and state tax liability and prepare and print tax returns.  Andersen has licensed Tax Director to approximately 700 corporate customers, including Norwest.  The agreement between Norwest and Andersen states that Tax Director contains trade secrets and prohibits Norwest from transferring Tax Director to others or allowing others to use it.

---

[2]The Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

[3]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

According to Norwest and Andersen, Tax Director operates in the following way. First, the company inputs year-end account balances from its books to be used in calculating the tax, either by manually entering the applicable figures or exporting this data from a previously compiled database. Next, the entered figures are assigned certain codes that instruct the program how they are to be classified for tax purposes. "Tax destination codes" (TDC codes) assign figures to particular lines on the return; for example, figures to be identified as gross rents are assigned the number "052.0." Similarly, "ALT codes" are used to identify figures with their proper destination on schedules to be attached to the return. All TDC and ALT codes to be assigned to particular entries are determined before the year-end balances are entered into Tax Director. In other words, how certain figures are classified for tax purposes is determined by the program's operator; Tax Director itself does not perform such classifications.

The operator must also enter any adjustments needed to reconcile the difference between the company's book income and its tax income. These adjustments between a corporation's book income and the taxable income it reports on the return are reflected by the IRS's Schedule M. These Schedule M adjustments are determined before they are entered into Tax Director; the program itself does not determine Schedule M adjustments. Finally, the operator enters certain background information required by the return, such as the name and address of the taxpayer.

After the company's financial data is entered and the applicable codes and adjustments assigned, Tax Director generates the return and appropriate schedules. This process apparently involves simple arithmetical processes: Tax Director identifies all the information with a particular code, adds it up, and enters it on the appropriate line of the return. The program does, however, perform certain automatic adjustments to the information it receives. For example, Tax Director caps the figure calculated for reporting on the return as charitable deductions at ten percent of taxable income, as the Tax Code requires. The program also automatically reports taxable income as zero on

the return if the data it receives would indicate a negative taxable income. Tax Director stores all of the entered data, including the account balances, codes, and adjustments, into data files which are segregated from the actual program. Tax Director thus does not itself retain any direct information about the company's finances or tax liability.

Tax Director can also generate and print certain "audit trail reports" based on the financial data it is given. These include the "Detail Spreadsheet Report" (R2 report) and the "Adjusting Entry Edit Report" (E3 report). The R2 report organizes and tabulates the year-end summary information for book balances and indicates for each account the TDC and ALT codes assigned, the Schedule M adjustments made, and the resulting adjusted tax balance. The E3 report likewise indicates the classifications and Schedule M adjustments assigned to each account. According to Norwest and Andersen, when Tax Director creates audit trail reports, it is not designed to save the data so that it may be viewed or manipulated by other commercially available software such as a spreadsheet program, nor is Tax Director itself designed to further view or edit this data. The program does, however, save this information as "print files." According to Norwest and Andersen, skilled computer technicians can convert these print files to spreadsheet-accessible files, and Norwest did in fact create such files for use in preparing its state income tax returns.

### B.     The Audit of Norwest

In April of 1992, the IRS began an audit of Norwest for the 1990 tax year. This audit later was expanded to included Norwest's 1991 tax liability. In the course of the audit, the IRS issued to Norwest numerous "Information Document Requests" (IDRs) requesting production of certain documents and records deemed relevant to the audit. On September 11, 1992, the agency issued IDR 26, requesting "a copy of the 'mapping' that takes place to translate the account totals on the [general ledger] report into line items on the tax return [including] Schedule M adjustments." Appellants' App. at 410. IDR 26 also indicated that "[w]e anticipate that this process includes the use of

Personal Computer based software of either an 'in-house' nature or a commercial package. Please provide a copy of these files in computer readable form." Id. In response to IDR 26, Norwest provided the IRS with a copy of an R2 report from the 1991 return.

In October of 1993, John Kuchera, the IRS computer audit specialist assigned to the Norwest project, orally requested that Norwest provide a copy of Tax Director. Norwest refused to produce Tax Director, but did provide the agency with two sets of computer diskettes. One set contained the unadjusted book balances entered into the program in completing the returns. The agency was able to easily access these files. The second set of diskettes were the adjusted tax balance files created by a Norwest employee from Tax Director's audit trail print files. These files presented the agency with some difficulty. Kuchera was eventually able to access the files, but testified that he was unable to verify whether they were accurate or complete.

The agency made no further requests for Tax Director until May 19, 1994, when it issued the designated summons at issue in this appeal. The summons directed Norwest to produce, among other things, the complete Tax Director program and all manuals and similar documents relating to the program. Norwest again refused to produce the software and its documentation. Instead, Norwest and Andersen met with agency auditors for several hours to demonstrate the program and its operation. This demonstration used generic data, and did not involve any Norwest-specific information.

Paragraph 2 of the summons requested "[a]ll data files, in machine sensible form, used by Tax Director to prepare the tax returns, or supporting computations, or upon which the Tax Director programs performed their functions." Appellants' App. at 16. In response to Paragraph 2, Norwest produced the original data files created by the program in creating the 1990 and 1991 returns. When the agency was initially unable to view these files, an Andersen employee explained that Tax Director itself had no capacity to manage the files, but instructed the agency computer specialists on how to

convert these files into a readable format. When the agency was still unsatisfied with its access to the Paragraph 2 files, Andersen offered to construct a "bridge program" that would allow the agency to download and view the files. Andersen created such a program, but the agency refused to accept the program when Andersen and Norwest offered the bridge program on the condition that the agency accept it in lieu of Tax Director and that the agency agree not to pursue the summons.

With the statute of limitations for the 1990 audit on the verge of expiration, the agency initiated this enforcement action, which suspended the statute. Andersen intervened in the proceedings. Following a hearing, the magistrate judge concluded that the summons should be enforced, with certain limitations intended to protect Andersen's proprietary interest in Tax Director. The district court modified certain aspects of the magistrate judge's order, but affirmed enforcement. On appeal, Norwest and Andersen reiterate their position that this kind of software is not within the IRS's summons authority, that it is not material to the audit, and that the agency has acted in bad faith. Norwest and Andersen also argue that production of Tax Director will require that Norwest violate Andersen's copyright, and that this vitiates the agency's summons authority.

## II.    DISCUSSION

Under section 7602 of the Internal Revenue Code, the IRS has the authority to issue summonses requiring taxpayers to produce records, documents, or other material relevant to an audit or to give testimony.[4] As it has done in this case, the agency may

_____

[4]IRC § 7602 provides in relevant part:

**(A) Authority to summon, etc.**--For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in

also issue a "designated summons" under IRC § 6503(j).  During the enforcement period of a designated summons, the statute of limitations for issuing a notice of deficiency is suspended.  IRC § 6503(j)(1).  The IRS is entitled to summon material if it satisfies a deferential standard for relevancy.  United States v. Powell, 379 U.S. 48, 57-58 (1964).

No court has addressed whether the agency's summons authority encompasses tax preparation software that itself contains no direct information about a particular taxpayer.[5]  Therefore, we face two important questions of first impression: whether the section 7602 summons power applies to this situation, and, if so, whether the agency has shown that its summons for this material is enforceable under Powell.

## A.     The Applicability of Section 7602

Section 7602 authorizes the IRS to summon "any books, papers, records, or other data which may be relevant or material" to an IRS investigation.  Given the agency's "broad mandate to investigate and audit 'persons who may be liable' for taxes," courts should be wary of "restrict[ing] that authority so as to undermine the efficacy of the federal tax system."  United States v. Bisceglia, 420 U.S. 141, 145-46 (1975).  The Supreme Court has stated that "'the administration of the statute may well be taken to embrace all appropriate measures for its enforcement, [unless] there is . . .  substantial reason for assigning to the phrase[s] . . . a narrower interpretation.'"  United States v. Euge, 444 U.S. 707, 715 (1980) (quoting United States v. Chamberlin, 219 U.S. 250,

---

respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized--

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry.

[5]IRS agent Gary Petersen testified that, to his knowledge, the agency had never before sought enforcement of a summons for tax preparation software.

269 (1911)). With these principles in mind, we must determine whether "books, papers, records, or other data" includes Tax Director.[6]

Norwest and Andersen argue that Tax Director is not a "record" or "other data" because the program itself does not contain or save any financial information particular to Norwest. Like any other computer program, it is a series of coded instructions that enable a computer to perform certain operations on data entered into it. The financial information that Tax Director used to generate Norwest's tax returns is not stored within the program, but is saved into completely segregated data files which have been provided to the agency. The copy of Tax Director the agency would receive from Norwest is no different from the software that Anderson licenses to hundreds of other corporate clients. Norwest and Andersen liken Tax Director to a calculator an individual taxpayer might use to complete a return, and argue that this kind of tool or asset is not within the agency's summons power.

Perhaps because it will usually be apparent whether a particular item is a "record" or "other data" under section 7602, there is a dearth of relevant case law.[7] Euge, however, suggests that "books, records, papers, or other data" under section 7602 cannot be defined as narrowly as Norwest and Andersen urge. In Euge, the Court considered "whether [the] power to compel a witness to 'appear,' to produce 'other data,' and to 'give testimony,' [pursuant to a section 7602 summons] includes the power

---

[6]The manuals, documents, and other written information related to Tax Director demanded in Paragraph 1 of the summons are obviously "books" or "papers." Thus, the only issue with regard to that material is whether it is relevant to the IRS's audit.

[7]We agree with Norwest and Andersen that two cases the IRS relies on are not entirely apposite. See United States v. Arthur Young & Co., 465 U.S. 805, 813-17 (1984) (upholding a summons for tax accrual workpapers retained by the taxpayer's accountant); United States v. Davey, 543 F.2d 996, 999-1000 (2d Cir. 1976) (enforcing a summons for magnetic tapes containing taxpayer-specific data) . Arthur Young and Davey do, however, indicate the broad summons authority section 7602 gives the agency.

to compel the execution of handwriting exemplars." 444 U.S. at 711. The Court held that this exercise of the summons power was "necessary for the effective exercise of the Service's enforcement responsibilities [and] entirely consistent with the statutory language." Id.

Norwest's and Andersen's arguments are reasonable, but they basically urge us to adopt a narrow interpretation of the types of information section 7602 encompasses. This is inconsistent with the approach in Euge and with our obligation "to liberally construe the powers given" the agency under the statute. United States v. Giordano, 419 F.2d 564, 569-70 (8th Cir. 1969). As Norwest itself states in its brief, "Tax Director consists of a set of instructions to the computer (i.e., algorithms) on how to sort and arrange financial data entered by a licensee, how to do simple arithmetic, and how to cause the data entered by the licensee to be printed on the lines of a federal income tax return." Appellant's Br. at 22. In light of the broad effect we are to give section 7602, a coded set of algorithms that sorts and arranges a taxpayer's financial information and then uses that information to generate the audited return can certainly be considered a "record" or "other data."

Norwest's and Andersen's argument that Tax Director is merely a "tool" such as a calculator is unpersuasive. First, simply labeling Tax Director a "tool" and pointing out that, in the end, numbers on the return are generated by arithmetical processes does not mean that the program is not also a "record" or "other data." Second, as the magistrate judge found, Tax Director is clearly much more sophisticated than a mere adding machine. It recognizes significant codes assigned to certain information based upon its intended tax treatment, organizes information based on those assignments, contains built-in limitations on the assignments a taxpayer can make, generates a return, creates files containing taxpayer financial data, and can generate detailed reports. We hold that the magistrate judge and district court correctly concluded that Tax Director was a "record" or "other data" under section 7602.

## B.    *Powell* Test

Under <u>United States v. Powell</u>, 379 U.S. 48, 57-58 (1964), a court must enforce a section 7602 summons if the IRS shows: (1) that the investigation is for a legitimate purpose; (2) that the requested material is relevant to the investigation; (3) that the material is not already in the agency's possession; and (4) that the proper administrative steps have been followed.[8]  Norwest and Andersen argue on appeal that the agency has not shown that the summoned material may be relevant, and that the summons was issued for an improper purpose.

### 1.    Relevance

The agency points to a number of ways Tax Director may be relevant to the audit. For the returns at issue, Tax Director was the final step in translating the company's summary book income into the information reported on the returns.  The agency thus contends that Tax Director is a critical link in the "audit trail," that is, the steps and processes that Norwest took in preparing its tax returns based on particular financial information.  According to the agency, access to Tax Director may assist the audit team in gaining a "big picture" view of Norwest's returns and in identifying areas for more detailed investigation.

The agency also points out that Norwest's consolidated returns represent financial information from more than 300 subsidiaries and affiliates, and that the company's use of Tax Director was the most important step in organizing this vast

---

[8]Norwest and Andersen argue that because Tax Director contains trade secrets of Andersen, we should apply a stricter test, and require the agency to show a "clear nexus" between the summoned material and Norwest's tax liability or that the material is necessary to complete the audit.  Neither the statute nor the case law provides any basis for a higher standard of relevancy in this case, and we therefore reject this argument.

amount of information.  Tax Director itself contains algorithms that generate return information based upon interpretations of the Tax Code and that affect how the return is generated.  While some of these functions, such as the automatic cap on charitable deductions, are clearly reflected on the return, others may not be; an Andersen employee testified that Tax Director contains other such automatic functions, but could not  recall what they were.  Finally, while Norwest did produce data files and audit trail reports created by Tax Director, the agency maintains that without Tax Director it is unable to verify whether this information is complete or accurate.

Norwest and Andersen offer a number of arguments for why they believe the agency's access to Tax Director will be unfruitful.  "Relevance" under the Powell test does not depend, however,  on whether the information sought would be relevant in an evidentiary sense, but merely whether that information might shed some light on the tax return.  Arthur Young, 465 U.S. at 813-14 & n.11.  The IRS need not state with certainty how useful, if at all, the summoned material will in fact turn out to be.   Id. at 814.  Furthermore, it is for the agency, and not the taxpayer, to determine the course and conduct of an audit, and "the judiciary should not go beyond the requirements of the statute and force IRS to litigate the reasonableness of its investigative procedures."  United States v. Clement, 668 F.2d 1010, 1013 (8th Cir. 1982).

Norwest and Andersen also contend that the agency has never before felt a need to examine Norwest's tax preparation software in prior audits, and that the IRS can adequately "tie up" Norwest's returns to the book financial data by way of the data files and audit trail reports already provided.  The issue, however, is not whether the IRS needs the software and supporting material in order to tie the final entries on the return to the detailed or summary financial data.  There is, indeed, little question that it would be possible for the agency to tie the return information back to the input (that is, reconcile Norwest's tax income with its book income) without the software.  But the agency's summons authority does not depend on whether the lack of certain information would make such reconciliation impossible, but whether the summoned material might

"illuminate any aspect of the return." Arthur Young, 465 U.S. at 815. Under this broad standard, the agency has sufficiently shown that the material it seeks may assist the audit team in understanding the return and in focusing the investigation.

### 2.    Legitimate Purpose

Norwest and Andersen contend that the agency's actual purpose in issuing the designated summons was to suspend the statute of limitations, which otherwise would likely have expired before the audit was completed. This, they maintain, was not a legitimate tax collection or determination purpose under the Powell test.

The appellants' arguments, however, basically boil down to repeating their position that the agency's stated purposes for seeking Tax Director are inadequate, and concluding from this that the IRS's real purpose could only be to extend the statute of limitations. Because we conclude that the agency's explanations for how Tax Director may be relevant to the audit are legitimate, we cannot accept appellants' premise. Because the audit was conducted in order to verify Norwest's tax liability for 1990 and 1991 and the IRS has demonstrated how Tax Director may be relevant to the audit, we hold that the summons was issued for a legitimate purpose. The IRS has therefore met its minimal burden under Powell, and is entitled to enforcement of the designated summons.

### C.    Summons of Copyrighted Material

Norwest and Andersen argue that because the summons forces Norwest to copy and produce to the IRS Andersen's copyrighted products, the summons will require Norwest to violate Andersen's copyright. Appellants maintain that this puts section 7602 in conflict with the Copyright Act, and that the district court thus should not have enforced the summons.

The district court noted that appellants' argument is "essentially . . . that, when in conflict, the Copyright Act trumps the IRS's statutory authority to issue  summonses." United States v. Norwest Corp., No. 4-94-MC-36, slip op. at 2-3 (D. Minn. Dec. 12, 1995).  We agree with the district court that there is no authority for this proposition. Section 7602 does not indicate that a properly issued summons for relevant material is limited to uncopyrighted material.  Nor does the Copyright Act indicate that copyright protection insulates either the copyright owner or the possessor of the particular item from producing that item in response to an IRS summons.  To the extent that Andersen's proprietary interest in Tax Director may be threatened by enforcement of the summons, the restrictions imposed by the district court on the IRS's use of Tax Director adequately protect that interest.[9]

Finally, Norwest and Andersen maintain that the agency waived any right to issue a summons for Tax Director when it entered into a records retention Letter Agreement with Norwest shortly after the audit began.  Appellants also argue that the summons was not a "designated summons" because it was not issued to determine Norwest's tax liability.  We have considered these and other arguments and find them without merit.

---

[9]The district court concluded that the IRS must identify those agents to whom Tax Director would be provided, notify the court of any additional persons who would receive the program, use the program only in connection with the audit, and return all copies of the program and destroy any documents or notes related to the program upon the audit's completion.  The agency maintains that section 7602 does not give the district court authority to impose such conditions, but does not challenge them on appeal.  Accordingly, we express no opinion on this question.

## III.  CONCLUSION

For the reasons discussed above, we affirm the order of the district court in all respects.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.