**UNITED STATES of America Petitioner,**

v.

**CALTEX PETROLEUM CORP., et al., Respondents.**

No. 3–96–CV–2726–X.

United States District Court,
N.D. Texas,
Dallas Division.

April 16, 1998.

Loretta C. Argrett, Deborah H. Meland, Rachel D. Cramer, David A. Haimes, Washington, DC, for Plaintiff.

G. Luke Ashley, Emily A. Parker, Thompson & Knight, P.C., Dallas, TX, for Defendant Caltex.

John P. Pinkerton, David R. Nelson, Jones, Day Reavis & Pogue, Dallas, TX, for Defendant Computer Language Research, Inc.

## FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

KAPLAN, United States Magistrate Judge.

This case has been referred to the United States magistrate judge pursuant to 28 U.S.C. § 636(b) and an order of reference dated January 9, 1997. The findings and recommendation of the magistrate judge are as follow:

### I.

This is a summons enforcement action brought under 26 U.S.C. § 7604. Petitioner is the United States of America. Respondents are Caltex Petroleum Corporation ("Caltex") and Computer Language Research, Inc. ("CLR").[1]

Caltex is a multi-national corporation that refines and markets petroleum products in Asia, Africa, and Australia. The company operates through 11 wholly owned subsidiaries, 17 minority-owned foreign corporations, and 92 controlled foreign corporations. Caltex pays taxes on the income of its foreign subsidiaries in the various countries where they are incorporated. In order to avoid double taxation, Caltex typically reports a foreign tax credit on its consolidated U.S. income tax return. The foreign tax credit is a dollar-for-dollar credit on all taxes paid or "deemed paid" to a foreign taxing authority. Historically, this credit has represented a substantial portion of Caltex's tax return. For example, Caltex claimed $125,795,115 in foreign tax credits against $141,275,301 in total taxable income in 1990. This reduced the effective tax rate of the company to

---

1. Price Waterhouse, L.L.P. was originally named as a respondent in this case, but was dismissed by agreement of the parties on April 16, 1997.

3.73%. The calculation of this foreign tax credit is at the heart of the present dispute.

The Tax Reform Act of 1986 increased the complexity of calculating foreign tax credits. The taxpayer must divide its income into different categories known as "baskets." There is a separate limitation on the amount of foreign tax credit than can be claimed for each basket of income. Because the Tax Reform Act increased the number of potential baskets, the number of computations necessary to calculate the foreign tax credit also increased. The calculations themselves are mechanical and repetitive, involving mostly addition and subtraction. However, the Act also created perpetual earnings and profit pools within each basket. This further complicated the calculation of foreign tax credits and created the potential problem of computational errors being carried through from year to year.

Caltex used two computer software programs to help calculate its foreign tax credits. These programs are the International Tax Management System and the Foreign Tax Management System, also known as ITMS/FTMS. ITMS/FTMS are modules of a larger software program called the Tax Management System, which was originally developed and licensed by Price Waterhouse. Caltex used the ITMS/FTMS program to calculate the foreign tax credits on its amended 1987 and original 1989 and 1990 tax returns.[2] However, the company also relied on other software programs and made manual calculations in certain instances.

The Internal Revenue Service has been engaged in a five-year investigation into the potential tax liability of Caltex. The focus of this investigation is the foreign tax credits reported by the company for the years 1987–1990. In order to verify these credits, the IRS must recreate the "audit trail." This involves tracing the numbers shown on the tax returns back through the various computations used by the taxpayer to the raw data. The IRS typically uses information document requests, or IDRs, to accomplish this task. An IDR is the primary information-gathering tool used to reconstruct an audit trail. The IRS issued 297 of these requests to Caltex between May 1993 and August 1995. During this same time period, the IRS exam team and Caltex proposed more than 80 adjustments to the tax returns. (Resp.Ex. 15).

On December 6, 1993, the exam team assigned to the Caltex audit issued an IDR for an executable copy of the ITMS/FTMS software. (Resp.Ex. 16–101). Caltex refused to comply due to restrictions imposed under its licensing agreement and non-disclosure agreement with Price Waterhouse.[3] (Resp.Exh. 16–102). Instead, the company conducted a demonstration of the software for the exam team and produced twelve volumes of input and output reports generated by the program in connection with the 1990 tax return. Caltex offered to provide similar materials for its amended 1987 and original 1989 returns. However, this offer was rejected. Caltex demonstrated the software again in July 1994 and January 1995 using actual Caltex data. Price Waterhouse also conducted demonstrations for members of the exam team using Caltex data in July and September 1994. After the last Price Waterhouse demonstration, the IRS assistant commissioner of international taxation issued a

---

**2.** Caltex used a Lotus 1–2–3 spread sheet to prepare its original 1987 and 1988 tax returns.

**3.** The proprietary information non-disclosure agreement provides, in relevant part:

Caltex, as licensee to the Tax Management System (TMS) hereby agrees to keep confidential all proprietary and user exclusive information with respect to TMS. Such information includes but is not limited to the following items: (a) user documentation; (b) actual software programs; (c) system design information; and (d) system benefits and features and other performance related matters.

The licensing agreement provides:

Licensee acknowledges that, absent legal process, in no event shall Licensee provide to third parties (including without limitation governmental taxing, enforcement or regulatory agencies, *such as the Internal Revenue Service* ) either copies of or access to the Software or related documentation. In the event that Licensee receives from a third party a request or demand, through legal process or otherwise, for copies of or access to the Software or related documentation, Licensee shall immediately so advise Price Waterhouse, and shall afford Price Waterhouse a reasonable opportunity to intervene and resist such disclosure. (Petition, Ex. A–2).

report describing why access to the ITMS/FTMS software was needed to complete the audit trail. The report gave recommendations for obtaining the software and noted that "if a system error is discovered, all taxpayers utilizing [ITMS/FTMS] could be subject to examination." (Govt. Ex. 25 at 12). On October 21, 1994, the IRS issued a summons to Caltex for an executable copy of the ITMS/FTMS software and related documentation. (Petition, Ex. A–1). Caltex refused to comply with the summons, citing its licensing agreement with Price Waterhouse. The company further indicated that it had made available to the IRS all the information necessary to verify the accuracy of the tax returns. (Petition, Ex. A–2).

It appeared that this impasse had been resolved in June 1995 after a meeting between Powell Banning, general tax counsel for Caltex, and Tom Crawford, the IRS audit case manager. Caltex agreed to use ITMS/FTMS to recalculate its foreign tax credits incorporating all proposed adjustments. The IRS would then compare the results with those generated by its own computer software program and try to have the audit completed in three to four months. (Resp.Ex. 5–2–F). However, Crawford was subsequently taken off the audit and the new case manager refused to honor the agreement.

The parties met again in September 1995. Caltex was represented by Banning and Joni Way, its coordinator of U.S. tax audits.[4] Glen Duncan, chief examiner for the North Texas office, and Jerry Jones, a computer audit specialist, participated on behalf of the IRS. Jones indicated that the computer specialists working on the Caltex audit wanted access to the source code for the ITMS/FTMS software. "Source code" is the human readable form of the software program. Simply stated, source code instructs the computer how to carry out the various functions the software is designed to perform. Duncan indicated that Caltex might be a "test case" for the IRS's authority to summon source code.

On October 6, 1995, two assistant IRS commissioners issued a memo reaffirming their interest in gaining knowledge of tax preparation software programs. (Govt.Exh. 26). Less than three weeks later, the IRS summoned the ITMS/FTMS source code and related documents from Price Waterhouse. (Petition, Ex. A–5). Price Waterhouse refused to comply with the summons due to the confidential and proprietary nature of these materials. It also argued that the source code and associated documents were not "books, records, papers, or other data" within the meaning of 26 U.S.C. § 7602(a). (Petition, Ex. A–6). Shortly thereafter, Price Waterhouse sold its rights in the ITMS/FTMS software to Computer Language Research, Inc.

On May 8, 1996, the IRS issued another summons to Caltex for an executable copy of the ITMS/FTMS software and related documentation.[5] (Petition, Ex. A–7). Price Waterhouse and CLR each received a summons for the source code, an executable copy of the software, and related documents on May 10, 1996. (Petition, Ex. A–8 & A–9). All three respondents refused to comply. (Petition, Ex. A–10, A–11, & A–12). In particular, CLR indicated that it would not produce an executable copy of the software without significant restrictions and that it would not produce the source code under any circumstances.[6] (Petition, Ex. A–12). The government filed this summons enforcement action on September 27, 1996. Caltex filed a motion to quash the summonses on December 18, 1996.

An evidentiary hearing was held on October 14–16, 1997. Deborah S. Meland, Rachel

---

4. Way was promoted to assistant comptroller effective January 1, 1998.

5. This was a "designated summons" under 26 U.S.C. § 6503(j), which tolled the statute of limitations on the Caltex audit. *See* 26 U.S.C. § 6503(j)(1) (issuance of designated summons within sixty days of expiration of statute tolls limitations period during any judicial enforce-

ment proceeding). The statute of limitations was due to expire September 30, 1996. (Petition ¶ 18.)

6. Caltex and CLR subsequently agreed to produce an executable copy of the ITMS/FTMS software and a user's manual. These materials were furnished to the IRS on April 16, 1997.

D. Cramer and David A. Haimes appeared for the government. G. Luke Ashley appeared for Caltex. John P. Pinkerton and David Nelson appeared for CLR. The issues have been fully briefed by the parties and this matter is ripe for determination.

## II.

■ A district court may enforce an IRS summons if the respondent fails to produce records that are relevant to a legitimate tax inquiry. 26 U.S.C. § 7604; *United States v. Wyatt*, 637 F.2d 293, 299–300 (5th Cir.1981). The government must prove that: (1) the investigation is being conducted for a legitimate purpose; (2) the summons is relevant to that purpose; (3) the information sought is not already in the possession of the IRS; and (4) all proper administrative procedures have been followed. *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964); *Barquero v. United States*, 18 F.3d 1311, 1316 (5th Cir.1994). The burden then shifts to the taxpayer to challenge the summons on any "appropriate ground." *Powell*, 85 S.Ct. at 255; *Barquero*, 18 F.3d at 1316–17.

## III.

The IRS seeks the source code for the ITMS/FTMS program so it can replicate the audit trail used by Caltex in preparing its tax returns. According to the IRS, the information produced to date does not reveal how Caltex computed its foreign tax credits.[7] Moreover, the IRS has identified certain potential errors in the software while using the executable copy. (Govt.Ex. 4–13). The examiners admit that these potential errors do not represent actual mistakes in the tax returns. Rather, they are examples of areas in which the audit team cannot verify the accuracy of the numbers generated by ITMS/FTMS.

One example of such a potential error involves so-called "look-through" calculations under the tax code. (Govt. Ex. 4 & 5).

"Look-through" rules are applicable to transactions between controlled foreign corporations. Simply stated, it requires the payee corporation and payor corporation to categorize payments in the same income basket.[8] However, there are numerous exceptions and qualifications to these rules based on the factual circumstances surrounding any particular transaction. In addition, look-through calculations must be done category by category in a particular order prescribed by the tax code.

Revenue Agent Gaynelle Schroeder testified about this aspect of the Caltex return. Schroeder is a foreign tax credit specialist and provided technical assistance to the international examiners on the Caltex audit team. She identified examples in the Caltex tax return where the payee corporation had not categorized income in the same manner as the payor corporation. Schroeder said that she could only make "educated guesses" as to what possible factual circumstances and legal exceptions might have warranted these variations from the general look-through rules. Caltex tried to explain these calculations in informal discussions with the IRS, but eventually conceded that at some point "the system just takes over." Schroeder stated that she could not verify whether the ITMS/FTMS program followed the ordering rules that apply to look-through calculations.

The IRS believes that the source code will reveal the various calculations performed by ITMS/FTMS in computing foreign tax credits. David Lorge Parnas, an expert in the field of software analysis, testified that he could easily find the relevant portions of the source code by using a technique known as "slicing." Parnas further explained that examining the source code was the best way to determine whether the software has any "bugs," since such programming errors are not necessarily revealed by merely testing the software with sample data.

---

7. The formulae used by the software program is not self-evident because the tax code permits a taxpayer to choose among several reasonable methods in calculating its foreign tax credits.

8. There are also look-through rules applicable to transactions between controlled foreign corporations and the parent corporation. However, that aspect of the rule was not fully developed at the hearing.

CLR argues that the ITMS/FTMS source code is its most valuable asset and gives the company a competitive advantage over other tax preparation software developers.[9] Stephen Winn, President and Chief Executive Officer of CLR, testified that his company purchased the software and other assets from Price Waterhouse for "a little under $15 million." Winn is concerned that anyone who has access to the source code could develop a less expensive tax preparation program and become a potential competitor. This would effectively put CLR out of business.

CLR disputes that the IRS needs the source code to complete the Caltex audit. It points out that the agency has failed to used normal investigatory tools to resolve many of the outstanding issues. For example, the IRS has not issued any IDRs regarding the potential errors in the ITMS/FTMS software. Nor has the agency made any follow-up requests to resolve questions that were not satisfactorily answered in informal discussions with Caltex representatives. In fact, the IRS has issued only two IDRs since it first summoned the source code in October 1995. CLR also claims that many of the potential errors do not impact the Caltex audit because ITMS/FTMS was not used to make the calculations in question or the issue has been otherwise resolved.[10] Finally, CLR argues that IRS can use its own software package to audit the Caltex returns. The System for Tax Audit Review, or STAR, was developed by CLR and licensed to the IRS as an auditing tool. Like ITMS/FTMS, the STAR program is capable calculating foreign tax credits. The audit team ran the foreign tax credits reported by Caltex on its 1987 amended return through STAR. Although several discrepancies were noted between the results obtained by the two programs, Caltex was able to reconcile them. Yet the IRS has not run the reconciled numbers through STAR to determine if they support the Caltex return and has refused to use the STAR program to audit the remaining returns.

CLR also presented testimony from Paul Goldberg, an expert in the design, development and testing of computer software. Goldberg said that examining source code is the least efficient and most time consuming method of verifying the validity of a software program. The ITMS/FTMS software contains some 770,000 lines of source code, most of which have nothing to do with the calculation of foreign tax credits. Goldberg testified that programmers typically detect "bugs" by testing the program with sample data and comparing the results obtained with a known result. Several witnesses testified that those figures can be verified using a hand-held calculator and a copy of the tax code.

CLR further contends that there is no practical way for it to comply with the summonses. The "related documentation" requested by the IRS comprises some 23 volumes of programming data, 14 lateral file drawers, and 250 boxes of notes and papers that are neither organized nor indexed. Moreover, the source code maintained by CLR is not necessarily identical to the source code used by Caltex in preparing its tax returns. This is because Caltex does not have all the modules in the TMS program and may have added updates and bulletins to the original software.

## IV.

■ CLR opposes enforcement of the October 23, 1995 and May 8, 1996 summonses on several grounds.[11] First, it argues that source code is not a "book, paper, record, or

---

9. The government concedes that the source code is a trade secret.

10. Caltex does not use ITMS/FTMS to apportion foreign taxes based on earnings and profits as discussed in Government Exhibit 6. Nor does it use the optimization feature referenced in Government Exhibit 12. Caltex acknowledged that there were problems with inconsistent figures in the earnings and profit pools as shown in Government Exhibit 13. However, these problems were resolved prior to the hearing.

11. Caltex does not have a direct interest in whether the IRS obtains the ITMS/FTMS source code. However, it believes that giving the government access to this information will prolong the audit of its 1987–1990 tax returns. Caltex states that it would rather contest a statutory notice of deficiency in tax court than be held hostage to an investigation that has lasted nearly five years.

other data" within the meaning of 26 U.S.C. § 7602(a). Second, CLR contends that the summonses were not issued for a legitimate purpose and the information sought is not relevant to the Caltex audit. Third, CLR asserts that enforcement of the summonses would be unduly burdensome, constitute an abuse of process, violate its Fifth Amendment rights, and contravene the policies expressed in the federal trademark and copyright laws. The Court will address each argument in turn.[12]

### A.

CLR first contends that the IRS lacks statutory authority to summon the ITMS/FTMS source code because it does not contain any "records" or "other data" related to Caltex. Rather, CLR maintains that source code is a proprietary asset of the company.

This issue has never been addressed by the Supreme Court or the Fifth Circuit. However, the question was squarely presented in *United States v. Norwest Corporation*, 116 F.3d 1227 (8th Cir.1997). The taxpayer in *Norwest* used a tax preparation program to prepare its 1990 and 1991 consolidated federal income tax returns. The software was copyrighted by Arthur Anderson & Co. and licensed to the taxpayer for a three-year period. The licensing agreement prohibited the taxpayer from transferring the software to anyone else. The IRS issued a summons for certain documents related to this tax preparation program as part of a company-wide audit. The taxpayer and Arthur

Anderson argued that the software was not a "record" or "other data" because the program itself does not contain or save any financial information particular to the taxpayer. This argument was rejected at trial and on appeal. The Eighth Circuit held that "a coded set of algorithms that sorts and arranges a taxpayer's financial information and then uses that information to generate the audited return can certainly be considered a 'record' or 'other data.'" *Id.* at 1232.

■ The Court finds this reasoning persuasive. The clear language of section 7602(a) permits the IRS to summon *any* record that may be relevant or material to a legitimate tax inquiry. *See* 26 U.S.C. 7602(a). The ITMS/FTMS source code contains instructions that tell the computer how to calculate foreign tax credits. Those instructions include various choices and calculations permitted by the tax code. If Caltex had not used a computer program to make those choices and perform those calculations, that information would have been reflected in its own work papers or records. Caltex has, in effect, adopted the computations made by the computer program. To that extent, the source code contains "other data" specific to the taxpayer.

■ CLR further contends that source code cannot be considered a "record" or "other data" because it is a proprietary asset used to create software products licensed by the company. However, these terms are not necessarily mutually exclusive.[13] An "asset"

---

12. Both parties seem to suggest that the Court may place reasonable restrictions on enforcement of the summonses to protect the confidential and propriety nature of the source code. (Resp. Brief at 71–76; Tr–I 14–15). However, the Fifth Circuit has held otherwise. *See United States v. Barrett*, 837 F.2d 1341, 1349–51 (5th Cir.1988), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989). A district court can only decide whether an IRS summons should or should not be enforced. This determination must be made based on the criteria established in *Powell*. The court explained that "[t]here is no middle ground because to create that remedy would unduly hamper the investigative efforts of the IRS." *Id.* at 1350. Although the parties may agree to reasonable restrictions, they have failed to do so in this case.

13. CLR relies on *Becker v. United States*, 451 U.S. 1306, 101 S.Ct. 3161, 68 L.Ed.2d 828 (1981), for

the proposition that the IRS cannot obtain unrestricted access to a proprietary asset. *Becker* involved an IRS summons directed to certain videotapes as to which the taxpayer claimed depreciation and investment tax credits. Justice Rehnquist temporarily stayed enforcement of the summons on the basis that the videotapes were assets, not records. *Id.* 101 S.Ct. at 3161, 3164. However, this ruling merely preserved the status quo pending appeal. Justice Rehnquist clearly stated that he was "by no means convinced of the correctness of the position of either party" and that his conclusions were "not entertained without considerable doubt." *Id.* at 3163, 3164. The order was later vacated. *Becker v. United States*, 452 U.S. 935, 101 S.Ct. 3073, 69 L.Ed.2d 949 (1981). For these reasons, the opinion in *Becker* has little precedential value.

can also be a "record" if it otherwise satisfies the requirements of the statute. Moreover, the tax code places no conditions on access based on the form in which the record is maintained. *United States v. Davey,* 543 F.2d 996, 999 (2d Cir.1976). The Court therefore concludes that the ITMS/FTMS source code is a "record" or "other data" within the meaning of 26 U.S.C. § 7602(a).

### B.

■ Next, CLR argues that the IRS has failed to establish the necessary prerequisites for enforcement of the summons. It maintains that the summons was not issued for a legitimate purpose and the information sought is not relevant to the Caltex audit.[14]

### 1.

■ The IRS may summon information for the legitimate purpose of ascertaining the correctness of a tax return or determining tax liability. 26 U.S.C. § 7602(a); *Barrett,* 837 F.2d at 1344. A summons issued for any other purpose is not valid. *See, e.g. United States v. Humble Oil & Refining Co.,* 488 F.2d 953, 960 (5th Cir.1974), *vacated and remanded,* 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975), *aff'd,* 518 F.2d 747 (5th Cir.1975) (summons for information to assist IRS in research project).

■ CLR contends that the IRS summonses are not being used for the legitimate purpose of determining Caltex's tax liability, but rather as part of a national policy to gain access to tax software source codes. This argument has considerable merit. It appears that the Caltex audit team was singularly focused on obtaining access to the ITMS/FTMS software and source code. The IRS inexplicably rescinded an agreement with Caltex that would have concluded the audit in three to four months. Caltex had agreed to recalculate its foreign tax credits using ITMS/FTMS and compare the results with those generated by an IRS computer software program. Instead, the audit team

under the direction of a new case manager demanded access to the ITMS/FTMS source code. Caltex was told that this might be a "test case" for the IRS's authority to summon source code. A summons was issued just one month later. Since that time, all normal investigatory avenues have been abandoned. The IRS has made no discernible effort to resolve any outstanding issues related to the Caltex audit without access to the source code. Moreover, the agency has refused to use its own software program to audit the Caltex tax returns.

■ Despite any disagreement over the effectiveness and efficiency of examining source code, there is no dispute that it contains *some* information underlying the Caltex returns. The Court has serious questions about the true motives of the IRS. However, at least some members of the audit team believe that the source code would help them determine Caltex's tax liability. This is a legitimate purpose. That the government may have a dual purpose or mixed motives in seeking the information is irrelevant. *Tiffany Fine Arts, Inc. v. United States,* 469 U.S. 310, 317 n. 5, 105 S.Ct. 725, 729 n. 5, 83 L.Ed.2d 678 (1985); *United States v. Theodore,* 479 F.2d 749, 753 (4th Cir.1973). The summonses are valid if just *one* of the expressed purposes is legitimate

The Court is unable to conclude that the ITMS/FTMS source code was summoned *solely* for an illegitimate purpose. Accordingly, the summonses are not invalid on this ground.

### 2.

■ CLR also challenges the relevance of the source code to the Caltex audit. The standard of relevance is lower in a summons enforcement action than in other judicial proceedings. *United States v. Arthur Young & Co.,* 465 U.S. 805, 814, 104 S.Ct. 1495, 1501, 79 L.Ed.2d 826 (1984). The IRS is specifically authorized to summon information that "may be" relevant to its investiga-

---

**14.** CLR also asserts that the IRS already has all information reasonably necessary to conduct the Caltex audit. This argument is untenable. The standard is not whether the IRS has enough information to complete the audit, but whether

the information summoned is already in the possession of the IRS. *See Powell,* 85 S.Ct. at 257–58. There is no question that the IRS does not currently possess the source code.

tion. 26 U.S.C. § 7602(a). Under this standard, information is relevant if it "might shed light on" any aspect of the return. *Wyatt,* 637 F.2d at 300; *United States v. Matras,* 487 F.2d 1271, 1274 (8th Cir.1973); *United States v. Egenberg,* 443 F.2d 512, 513 (3d Cir.1971); *United States v. Shlom,* 420 F.2d 263, 265 (2d Cir.1969), *cert. denied,* 397 U.S. 1074, 90 S.Ct. 1521, 25 L.Ed.2d 809 (1970).

 On the other hand, the IRS is not permitted to conduct a rambling and unfocused "fishing expedition" through a party's records. *United States v. Richards,* 631 F.2d 341, 345 (4th Cir.1980); *United States v. Dauphin Deposit Trust Co.,* 385 F.2d 129, 131 (3d Cir.1967), *cert. denied,* 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1968). The relevancy inquiry should be especially searching when the summons is directed to a third party. *Venn v. United States,* 400 F.2d 207, 211 (5th Cir.1968); *United States v. Harrington,* 388 F.2d 520, 524 (2d Cir.1968). In such cases, the government must show "a realistic expectation rather than an idle hope that something may be discovered." *Wyatt,* 637 F.2d at 300–01; *Harrington,* 388 F.2d at 524; *see also Arthur Young & Co.,* 104 S.Ct. at 1501 n. 11; *Matras,* 487 F.2d at 1274.

 CLR claims that source code is not relevant to the Caltex audit for two reasons. First, it argues that examination of the source code is so inefficient and time consuming that it will actually delay completion of the audit. This argument misses the mark. CLR has failed to articulate how inconvenience establishes a lack of relevance. *Cf. Matras,* 487 F.2d at 1275 (the term "relevant" connotes and encompasses more than "convenience."). Although there may be more effective and efficient ways to detect software errors, neither this Court nor CLR can tell the IRS how to conduct its audit. *Norwest,* 116 F.3d at 1233. CLR also points out that the exam team has not identified any actual errors in the program. However, the IRS may summon evidence simply "on the mere suspicion that the law is being violated, or even just because it wants assurance that it is not." *Powell,* 85 S.Ct. at 255.

 CLR also contends that the source code is irrelevant because ITMS/FTMS does not perform all of the calculations necessary to compute the foreign tax credits reported by Caltex on its returns. However, the program was designed to calculate foreign tax credits and was used by Caltex for that purpose. With respect to those calculations, the source code "might shed light" on the return. *See Wyatt,* 637 F.2d at 300. The Court finds that the summoned information is relevant.

### C.

The government has established a *prima facie* case under *Powell.* However, that does not necessarily mean that the summonses must be enforced. CLR may still challenge the summonses on "any appropriate ground." *Powell,* 85 S.Ct. at 255. Four such grounds are raised in this case. CLR contends that enforcement of the summonses would: (1) constitute an abuse of process; (2) violate its Fifth Amendment rights; (3) contravene the policies expressed in the federal trademark and copyright laws; and (4) create an undue burden and hardship. The Court finds the first issue dispositive and quashes the summonses on that basis.

### 1.

 A summons may be quashed where enforcement would otherwise constitute an abuse of the court's process. *Powell,* 85 S.Ct. at 255; *United States v. Barrett,* 837 F.2d 1341, 1344–45 (5th Cir.1988). The *Powell* court recognized that "[s]uch an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell,* 85 S.Ct. at 255. These grounds are not exhaustive. The parameters of abuse of process must remain flexible in order to prevent other forms of agency abuse of congressional authority and judicial process. *SEC v. ESM Government Securities, Inc.,* 645 F.2d 310, 314 (5th Cir.1981), *quoting United States v. LaSalle National Bank,* 437 U.S. 298, 318 n. 20, 98 S.Ct. 2357, 2368 n. 20, 57 L.Ed.2d 221 (1978). However, the burden to establish such a claim in a summons enforcement action is a heavy one. Most

courts require evidence of bad faith or egregious misconduct by the agency. *United States v. Texas Heart Institute*, 755 F.2d 469, 482 (5th Cir.1985) (IRS planned to unlawfully disclose the summoned documents); *United States v. Deak–Perera & Co.*, 566 F.Supp. 1398, 1402 (D.D.C.1983) (IRS committed fraud in gathering information used to issue the summons). *See also ESM Government Securities*, 645 F.2d at 317 (fraud, deceit, and trickery constitute an abuse of process). This heavy burden is consistent with the reluctance of courts to circumscribe the broad summons authority given the IRS "absent unambiguous directions from Congress." *Barrett*, 837 F.2d at 1349, *quoting United States v. Arthur*, 465 U.S. 805, 816, 104 S.Ct. 1495, 1502, 79 L.Ed.2d 826 (1984).

### 2.

■ The overwhelming evidence shows that the summonses were issued for an improper purpose. The IRS does not need the ITMS/FTMS source code to audit the Caltex returns. Rather, this is just the first step to gaining unrestricted access to source code for *all* tax preparation software programs. The IRS has indicated that Caltex might be a "test case" to summon source code information. Two assistant IRS commissioners even issued a memo expressing their interest in gaining knowledge about these software programs. (Govt.Ex. 26). All of this occurred just a few months before the summonses were issued. The timing of these events is suspect, to say the least.

But these are more than just the paranoid suspicions of a skeptical judge. The record is replete with evidence to support this conclusion. The IRS has virtually ignored all other possible means of obtaining the information it needs to complete the Caltex audit. It has not issued a single IDR regarding any of the potential software errors identified in Government Exhibits 4–13. Several of the errors identified by the exam team are not even relevant to the audit. (Govt.Ex. 6, 12, 13). Most perplexing of all, the IRS has refused to use its STAR software to verify the foreign tax credits reported by Caltex on its 1989 and 1990 returns. The IRS used STAR to check the 1987 amended return and found several discrepancies. Those numbers were eventually reconciled by Caltex. The Court accepts the government's position that STAR is not meant to reconstruct a taxpayer's return. It also accepts that the numbers generated by STAR do not necessarily control in the event of an irreconcilable conflict with a tax return. However, none of this explains why the IRS has not even attempted to use STAR as a starting point for further discussion. Indeed, the Court questions why the IRS would have invested in STAR if it did not intend to use the program in just this type of situation.

The IRS has steadfastly maintained throughout this action that the Caltex audit is hopelessly stymied without access to the ITMS/FTMS source code. This position is rather disingenuous given the complete failure of the IRS to pursue more traditional auditing methods after the summonses were issued. It appears that the agency may have felt that pursuit of these other methods would be inconsistent with its position on access to the source code. The Court cannot condone such willful ignorance. The IRS is charged with the duty of verifying the accuracy of the Caltex returns. It cannot abandon that duty in favor of focusing on a single piece of information.

The Court recognizes that the ITMS/FTMS program may have bugs that affect the computation of Caltex's foreign tax credits.[15] However, it is unwarranted and excessive for the IRS to demand absolute assurance that no errors exist. The IRS can make a final determination of Caltex's tax liability without access to the source code. Caltex may then contest that determination in tax court. While the Court appreciates that the IRS wants to conduct the most thorough and accurate audit possible, it may not go about it in this way.

---

15. David Lorge Parnas testified that a "bug" in the program may not affect the results in 99 out of 100 tests. If this is true, then the IRS would still have to test the ITMS/FTMS program with sample data to determine whether the error affected any of the numbers reported by Caltex on its tax returns.

Finally, the ramifications of enforcing these summonses would be staggering. It would allow the IRS to audit the accuracy of tax management software programs rather than information contained in the taxpayer's return. Indeed, counsel for the IRS has taken the position that the agency is legally entitled to the source code for virtually *every tax preparation program on the market.* (Tr–III 226–27). This would significantly impact the property rights of these software manufacturers and jeopardize their competitive position in the marketplace. The Court should not hesitate to use its equitable powers to prevent this kind of abuse, oppression, and injustice. *ESM Government Securities,* 645 F.2d at 317, *citing Gumbel v. Pitkin,* 124 U.S. 131, 145–46, 8 S.Ct. 379, 384, 31 L.Ed. 374 (1888).

## RECOMMENDATION

The IRS is not entitled to the source code or related documents for the ITMS/FTMS program. Caltex's motion to quash the IRS summonses dated October 23, 1995 and May 8, 1996 should be granted. The government's motion to enforce the summonses should be denied.