**UNITED STATES of America,
Petitioner,**

v.

**John COX, Tax Director of BMC
Software, Inc. and Subsidiaries,
Respondent.**

No. Civ.A. H–98–2363.

United States District Court,
S.D. Texas,
Houston Division.

Jan. 8, 1999.

---

Joseph A Pitzinger, III, Dept of Justice, Tax Division, Dallas, TX, for U.S.

Karl S Stern, Vinson & Elkins, Houston, TX, for John Cox, Tax Director, Respondent.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

The Internal Revenue Service asks this court to enforce a summons issued to John Cox, the tax director of BMC Software, Inc. ("BMC") and its subsidiaries, in connection with the audit of BMC's 1993 tax return. The IRS seeks the production of computer source code for twenty-seven BMC enhancement software products marketed in Europe in fiscal year 1993. The IRS asserts that the source code will help ensure that in its 1993 tax return, BMC properly accounted for revenues it received from its European affiliate.

The primary issue in the audit is the proper valuation of intangibles transferred between BMC and its European affiliate. The IRS is examining whether BMC's taxable income reflects arms-length consideration for the transactions between BMC and its European affiliate. The issue in this summons enforcement action is wheth-

er the IRS can obtain BMC's source code for the software enhancement products distributed by its European affiliate in tax year 1993 as part of this inquiry.

BMC moves to quash the summons on a number of grounds. This court held a show cause hearing on the motion to quash. After careful consideration of the motions, the briefs, the parties' submissions, the testimony and exhibits presented at the show cause hearing, and the applicable law, this court DENIES the IRS's motion to enforce the summons and GRANTS Cox's motion to quash. The reasons are stated below.

## I. Background

### A. The Parties and Transactions at Issue

BMC designs and manufactures software products to support widely-used mainframe databases produced by other companies, such as IBM. BMC's software facilitates business operations by improving the performance of computer databases, safeguarding their structural integrity, and allowing users to load, unload, reorganize, and save data. (Tr. 24)[1]. BMC sells most of its products by "perpetual license." A customer pays a one-time license fee for the right to use a BMC software product. (Tr.79). BMC also offers maintenance agreements to purchasers of perpetual licenses. The one-time perpetual license fee includes one year of the maintenance plan. (Tr. 84–85). A customer seeking to renew its enrollment in the maintenance plan pays BMC an annual fee of twenty percent (eighteen percent in Europe) of the current perpetual license fee for that product. (Tr.82). Customers who renew the maintenance plan receive functional and performance enhancements to the software, including maintenance modifications to improve the product, newly released versions of the product, as well as technical support by telephone. (Tr. 55, 80).

In 1993, in response to growing sales in Europe, BMC created a subsidiary, based in Holland, to distribute its products in Europe. Through an intermediate entity,[2] BMC and its Dutch affiliate, BMC Software Distribution, B.V. ("BV1"), entered into a software manufacturing and distribution license agreement (the "Licensing Agreement"). Under the Licensing Agreement, BMC granted BV1 the nonexclusive right to reproduce and distribute in Europe all BMC software products that existed or were in development as of April 1, 1992. BV1 agreed to pay BMC a royalty of thirty-five percent of net European sales of the pre-April 1992 products. BMC and BV1 also entered into an agreement as to products developed after April 1992. Under a Cost Sharing Agreement, BV1 agreed to share in BMC's software development costs from and after April 1, 1992. In return, BV1 received the European intellectual property rights to the products created from this joint development effort. (R.Ex. 9)[3]. Both the Licensing Agreement and the Cost Sharing Agreement had five year terms and could be renewed in one year increments upon agreement by both parties. (R.Ex. 8, ¶ 6.1; R.Ex. 9, ¶ 3.1).

---

1. "Tr." refers to the transcript of the August 13, 1998 proceedings of the show cause hearing, found at Docket Entry No. 32. "Tr. II," refers to the transcript of the second day of the hearing, held on August 14, 1998, found at Docket Entry No. 33.

2. The transaction was not structured directly between BMC and BV1 because Dutch authorities required BV1 to maintain ownership of the technology offshore, outside Holland. (Tr. 103). BMC entered into a license agreement with an affiliate located in the Cayman Islands. ("BMC–Cayman"). BV1 and a sec-

ond Dutch affiliate, BV2, were partners in BMC–Cayman. The license agreement between BMC and BMC–Cayman granted BMC–Cayman the right to license BMC products in Europe. (R.Ex. 8). BMC–Cayman and BV1 then entered into a sublicense agreement under which BV1 obtained the right to distribute BMC products to European customers. (R.Ex. 10).

3. The term "R.Ex." refers to the respondent's exhibits admitted at the show cause hearing. The term "G.Ex." refers to the government's exhibits.

Under these two agreements, BMC kept exclusive ownership of pre-April 1, 1992 products. The European affiliate received the European ownership rights for enhancements and products developed after April 1, 1992, for which BMC and BV1 shared development costs.

In preparing its 1993 tax return, BMC accounted for the transactions under the two agreements with its European affiliate. BMC assumed that all the European licensing revenues generated in tax year 1993 were attributable to pre-April 1, 1992 products. BMC included all the license revenues in the royalty base and applied a thirty-five percent royalty that BV1 paid BMC. BMC's assumption put all of the 1993 license fees into the royalty base, despite the fact that some of the license fees received late in the fiscal year included enhanced or improved products attributable in part to cost-shared technology developed after April 1, 1992. (Tr. 116–18). On the other hand, BMC excluded all the maintenance fees paid in tax year 1993 from the royalty base. BMC concluded that the maintenance fees covered enhancements and improvements resulting from the post-April 1992 joint development work done under the Cost Sharing Agreement.

The IRS challenges BMC's tax treatment, primarily as to the maintenance fees. The IRS is concerned that by excluding maintenance revenues from the royalty base, BMC understated the compensation it received for the European distribution rights transferred to BV1. The IRS believes that BV1 retained income from maintenance products properly attributable to BMC, resulting in understated income tax liability for BMC.

## B. The IRS Audit of the 1993 Return

The IRS began auditing BMC's 1993 tax return in October 1994, focusing on BMC's intercompany transfer pricing. Under the Internal Revenue Code and accompanying regulations, the IRS is authorized to allocate income or deductions between commonly-controlled entities to prevent tax evasion or more clearly to reflect the income of those entities. *See* I.R.C. § 482. Transactions between such entities must take place at prices equivalent to those that would be charged in an arms-length transaction between unrelated parties under similar circumstances. *See* Treas.Reg. § 1.482–1(b).

The IRS has taken a primary and an alternative position on this issue. In its primary audit position, the IRS agreed with BMC that all revenues generated by BMC's licensing agreements with European customers in the 1993 tax year should be included in the royalty base. (Tr. 161; Tr. II. 39). Under its primary position, the IRS proposed to disregard the Cost Sharing Agreement between BV1 and BMC and increase the percentage of royalties paid to BMC out of all the European revenues from thirty-five to forty-five percent. The result would be an additional tax liability of $13,347,588.00. (R.Ex. 11, Tab I, Form 886A, p. 1). The IRS does not assert that source code is relevant to, or summonsed in connection with, the primary position in the audit.

The IRS does assert that source code is relevant to its alternative audit position. Under its alternative position, the IRS recognized the Cost Sharing Agreement between BMC and BV1. The IRS proposed that (1) ninety-five percent of all maintenance fees (excluding only five percent attributable to telephone support to customers) would be viewed as part of the license fee and included in the royalty base; (2) the initial royalty rate would be forty-five percent instead of thirty-five percent; (3) the rate of decline in the royalty rate in the four years after 1993 would be adjusted; and (4) a deferred royalty provision in the License Agreement would be ignored. (R.Ex. 11, Tab J, Form 886A, p. 1). The net effect of this position on BMC's 1993 tax liability is an increase of $24,124,945.00. (*Id.*). BMC emphasizes the fact that the IRS issued the proposed adjustments to the 1993 tax return without access to BMC's source

code for any of the 1993 software products distributed in Europe.

BMC first learned that the IRS intended to make adjustments to its transfer pricing structure in May 1996. (Tr. 124; R.Ex. 47). BMC provided the IRS with an internal intercompany pricing study BMC had prepared in connection with the creation of the Licensing Agreement and Cost Sharing Agreement; made the authors of the study available to the IRS; and responded to over one hundred Information Document Requests ("IDRs"). In September 1996, the IRS sent BMC its Notice of Proposed Adjustment ("NOPA").[4] (R.Ex. 11, Tabs I & J). With the NOPA, the IRS sent reports from an IRS international examiner, Timothy Marion (R.Ex. 11, Tab G); an IRS engineer, Bill Johnson (R.Ex. 11, Tab F); and an IRS economist, Dr. Peter Balash (R.Ex. 11, Tab E). In the NOPA, the IRS team told BMC of the proposed adjustments to BMC's gross income, based on recalculations of BMC's transfer pricing.

In September 1996, the IRS also issued the IDR seeking BMC's source code. BMC vigorously resisted, on the grounds that the source code was irrelevant to any issue in the audit and that any production carried an intolerable risk that BMC's valuable trade secrets would be revealed. This summons enforcement action followed almost two years of unsuccessful discussions. These discussions ended with the IRS maintaining the same proposed tax adjustments it had issued in September 1996 and insisting on the production of

source code as relevant to part of the IRS's alternative audit position. The IRS maintains that the source code will help it refine the calculation of the maintenance fees that the IRS contends should be included in the royalty base.

The only issue in this proceeding is whether BMC must provide its source code for twenty-seven software enhancement products distributed in Europe in the 1993 tax year.[5]

## C. The IRS Summons for the Source Code

Source code is the blueprint for BMC's software products. It is human-readable computer language, written by BMC programmers and developers. Source code is later translated into the executable object code used by customers in their individual computers. Source code provides a road map that details the inner workings of a software program.

The IRS does not dispute that source code is a trade secret. BMC has spent millions of dollars developing its source code base. (Tr. 60). BMC goes to great lengths to prevent its source code from falling into the hands of competitors. BMC restricts access to its buildings; restricts access to computers containing the source code; requires employees and contractors to sign confidentiality agreements; limits third-party contractors' access to the source code; requires customers to sign license agreements that include a prohibition on attempts at reverse engineering;

---

4. BMC filed its return for the fiscal year ending on March 31, 1993 on September 9, 1993. The statute of limitations on tax assessment expired on September 9, 1996, but in May 1996, BMC agreed to extend the statute of limitations to March 31, 1997 because the IRS had not completed its audit.

5. Only the first part of the summons requests computer source code. The second and third parts request product specification documents and pricing information on a number of products. The IRS contends that BMC has failed to argue or introduce evidence showing cause for failing to comply with the second and

third parts of the summons. BMC responds that it has supplied the IRS with the pricing information requested and with over 700 pages of product specification materials. The IRS consultant examining these documents apparently thought they were of little or no value. (Tr. II 15). The IRS's lead revenue agent conceded that BMC complied with the request for pricing information. (Docket Entry No. 1, Ex. 2, Declaration of Luther Jones, ¶ 5). In light of the parties' exclusive focus on the source code in their briefs and in the show cause hearing, this court limits its decision to the request for source code.

and vigorously pursues protection of the confidential status of the source code under patent, copyright, and trade secret laws. (Tr. 72–77).

The IRS did not ask BMC for source code until September 10, 1996,[6] when it issued IDR ENG # 23. The IRS made the request at approximately the same time it issued the NOPA and the final reports from the IRS audit team. (Tr. 129, 178). The request followed the IRS's retention of an outside computer consultant, Dr. Herbert Krasner, in August 1996. (R.Ex. 21). None of the IRS team members—international examiner Marion, economist Balash, or engineer Johnson—participated in the decision to hire Dr. Krasner. (Tr. 238; Tr. II 7, 52). None of these audit team members worked substantively with Dr. Krasner before writing their reports and issuing the NOPA in September 1996. (Tr. 191, 238–39; Tr. II 7–8, 52–53).

BMC objected to IDR # 23, vigorously contesting the relevance of the source code to the valuation issues in the audit and emphasizing the business risks BMC faced if any disclosure occurred. BMC representatives met with the IRS in October 1996 to attempt alternative means of providing relevant information to the IRS. (Tr. 129–31; Docket Entry No. 10, Ex. 1, Price Affidavit, ¶ 12). BMC asserted then, and reasserts here, that the source code has nothing to do with determining how much of the value of 1993 enhancement products provided to European purchasers of BMC's maintenance plans is attributable to pre-April 1992 technology. Ac-

cording to BMC, the IRS failed to provide a coherent reason explaining its request for source code. A second meeting between BMC representatives and the IRS on January 23, 1997 failed to resolve the issue of the source code request.[7]

On January 30, 1997, the IRS issued IDR ENG # 24. This IDR did not request source code. BMC produced the information requested, believing that it would enable Dr. Krasner to complete his report without source code. (Tr. 131–32). Between January and May 1997, Dr. Krasner attempted to use the data BMC provided under IDR ENG # 24 to determine how much of the value of the software enhancement products provided to European purchasers of maintenance plans in 1993 was attributable to pre-April 1, 1992 technology. (Exs.24–29). In May 1997, Dr. Krasner told the IRS that the information available was insufficient and that he needed source code to complete his "high quality review." (R.Ex. 29). The IRS issued IDR ENG # 25 on July 1, 1997.

While Dr. Krasner was working on his report, other aspects of the audit proceeded. The statute of limitations on tax assessment expired on March 31, 1997. BMC agreed to an extension of three months, until June 30, 1997. (Tr. 132–33; R.Ex. 15). In May 1997, the IRS requested, and BMC granted, a third extension of the statute of limitations, until August 31, 1997. BMC consented to this extension because the IRS stated that it needed the time to write its completed examination report (the "thirty-day letter") and send the case to IRS Appeals, the administra-

---

**6.** The original expiration date of the statute of limitations for tax assessment was September 9, 1996, but in May 1996, BMC had agreed to an extension to March 31, 1997.

**7.** BMC contends that at this meeting, the IRS agreed that the source code would not be useful in completing the audit. (Docket Entry No. 10, Ex. 1, Price Affidavit, ¶ 13). A BMC representative testified that at the meeting, Dr. Krasner stated that he did not need the source code to give the IRS information to help them analyze the tax treatment of the maintenance fees. (Tr. 132).

The IRS presents a different account of the January 1997 meeting. IRS representatives deny that either the IRS or Dr. Krasner disavowed the request for source code. (Tr. 212, 242–43; Tr. II 20; R.Ex. 24). Instead, the IRS maintains that it simply agreed to pursue alternative methods of acquiring the desired information. The only contemporaneous recording of the discussions, made by Dr. Krasner, confirms that the goal of the meeting was to explore other ways of gathering the desired information, without using source code. (R.Ex. 24).

tive appellate forum. (Docket Entry No. 10, Ex. 1, Price Affidavit, ¶ 16). BMC's understanding of the circumstances surrounding this third extension is confirmed by the IRS's cover letter to the extension form. (R.Ex. 16).

On June 11, 1997, BMC received the IRS's thirty-day letter. The IRS took the same positions on BMC's intercompany transfer pricing structure as it had in the NOPA in September 1996. By June 1997, BMC had complied with all outstanding IDRs except IDR #23, which BMC believed had been withdrawn. BMC began preparing its protest of the IRS's proposed adjustments. (Docket Entry No. 10, Ex. 1, Price Affidavit, ¶ 18; Tr. 135–36).

With the thirty-day letter, the IRS sent BMC a form requesting its consent to a fourth extension of the statute of limitations, until June 30, 1998. BMC once again agreed to the extension, believing that IRS Appeals would need the extra time to consider BMC's protest. (G.Ex. 144, p. 3). BMC's consent to the fourth extension was based on its intent to seek prompt review in an IRS Appeals forum. In the thirty-day letter, the IRS told BMC to "consent to extend the statute within 10 days or you will not be able to have an Appeals hearing." (R.Ex. 11, p. 1). After granting the extension, BMC requested that the IRS allow the administrative appeal to proceed. The IRS refused to allow the case to be transferred to IRS Appeals until the investigation was complete, requiring BMC to produce the source code in order to obtain IRS appellate review. (Tr. 138; Docket Entry No. 37, U.S. Requested Findings of Fact, ¶ 111).

On July 1, 1997, the IRS issued IDR ENG #25, renewing its request for BMC's source code. On July 25, 1997, the IRS served this summons. The IRS filed this lawsuit on January 30, 1998, asking this court to enforce the summons. This court held an evidentiary show cause hearing in August 1998. (Docket Entry Nos. 32, 33).

The overall dispute over the alleged tax deficiencies is ongoing. BMC filed its protest to the thirty-day letter on August 8, 1997. The IRS continues to refuse to transfer the case to IRS Appeals, in spite of the fact that the IRS admits that the source code is wholly irrelevant to the IRS's primary audit position, and despite the fact that the audit team has articulated and justified its alternative audit position without any source code.

On June 26, 1998, the IRS District Director issued BMC a statutory notice of deficiency for the 1993 tax year. The IRS took the same positions with respect to the intercompany transfer pricing adjustments as it had in the September 1996 NOPA and in the June 1997 thirty-day letter. On July 16, 1998, BMC filed suit in the United States Tax Court, requesting a redetermination of the deficiencies. The IRS is proceeding against BMC simultaneously in this summons enforcement proceeding and in the Tax Court suit, seeking the source code both through its summons authority and through discovery in the Tax Court.

## II. The Legal Standard for Enforcing a Summons

■ Section 7602(a) of the Internal Revenue Code authorizes the IRS to "examine any books, papers, records or other data" that will assist it in "ascertaining the correctness of any return, ... determining the liability of any person for any internal revenue tax, or ... collecting any such liability." *Id.* In *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the Supreme Court set out four elements that must be satisfied before a summons can be enforced: (1) the IRS investigation must be "conducted pursuant to a legitimate purpose"; (2) "the inquiry [must] be relevant to the purpose"; (3) "the information sought [must] not already [be] within the [IRS's] possession"; and (4) the "administrative steps required by the Code [must] have been followed." *Id.* at 57–58, 85 S.Ct. 248; *see also United States v. Barrett,* 837 F.2d 1341, 1344 (5th Cir.1988) (en banc).

■ The IRS bears the initial burden of showing that these four requirements have been satisfied. *See Barrett*, 837 F.2d at 1345. It can make its *prima facie* case under *Powell* by presenting the affidavit of the agent who issued the summons and is seeking enforcement. *See United States v. Davis*, 636 F.2d 1028, 1034 (5th Cir.1981); *2121 Arlington Heights Corp. v. IRS*, 109 F.3d 1221, 1224 (7th Cir.1997); *United States v. Rockwell Int'l*, 897 F.2d 1255, 1262 (3rd Cir.1990). In this case, the government has met its initial burden by presenting the affidavit of Revenue Agent Luther Jones. (Docket Entry No. 1, Ex. 2). The burden now shifts to BMC, the party resisting the summons.

■ A court may quash a summons if the resisting party disproves any of the four *Powell* elements or successfully challenges the summons on "any appropriate ground." *Powell*, 379 U.S. at 58, 85 S.Ct. 248. Such grounds include the violation of a substantial countervailing policy, *see United States v. Euge*, 444 U.S. 707, 711, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980); an excessive burden placed on a taxpayer, *see United States v. Humble Oil & Ref. Co.*, 488 F.2d 953, 959–60 (5th Cir.1974), *vacated on other grounds*, 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975); and overbreadth of the summons. *See United States v. Wyatt*, 637 F.2d 293, 302 (5th Cir.1981). A summons may not be enforced when it represents an abuse of the court's process, such as when it is issued solely to harass a party, to pierce legal privileges, to pressure settlement of collateral disputes, or for any other "bad faith" purpose. *See Powell*, 379 U.S. at 58, 85 S.Ct. 248; *Wyatt*, 637 F.2d at 301. To succeed on an abuse of process claim, a taxpayer must show bad faith by the IRS as an institution, not just an individual agent. *See United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978); *2121 Arlington Heights Corp.*, 109 F.3d at 1226. An agent's actions, however, can evidence the IRS's institutional posture. *See 2121 Arlington Heights*, 109 F.3d at 1226.

BMC asserts a number of challenges to the summons for its source code. BMC argues that "(i) the Source Code has no relevance to the audit, (ii) the Summons is an abuse of this Court's process, (iii) the Summons is unduly burdensome, (iv) Summons is inconsistent with the substantial countervailing policy of trade secret protection, (v) the Summons is overbroad, [and] (vi) enforcement of the Summons would result in an infringement of BMC's rights under the Fifth Amendment of the United States Constitution...." (Docket Entry No. 34, p. 2). In addition, BMC contends that the summons is beyond the IRS's statutory authority because the source code is not a "book[ ], paper[ ], record[ ], or other data" under section 7602(a). Each of these complaints is examined below.

## III. Relevance

### A. The Applicable Legal Standard

BMC's primary contention is that the source code is simply not relevant to any of the adjustments the IRS proposed for BMC's 1993 tax return. "The power of the IRS to investigate the records and affairs of taxpayers has long been characterized as an inquisitorial power, analogous to that of a grand jury, and one which should be liberally construed." *United States v. Matras*, 487 F.2d 1271, 1274 (8th Cir.1973). The IRS need not establish "probable cause" to enforce a summons. *See Powell*, 379 U.S. at 57, 85 S.Ct. 248.

■ The government's burden to show relevance, while not heavy, cannot be set aside or ignored. *See David H. Tedder & Assocs. v. United States*, 77 F.3d 1166, 1168 (9th Cir.1996) (citing *United States v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980)). The established test for relevance is "whether the summons seeks information which 'might throw light upon the correctness of the taxpayer's return.'" *Wyatt*, 637 F.2d at 300; *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 814 n. 11, 104 S.Ct. 1495, 79 L.Ed.2d

826 (1984); *David H. Tedder & Assocs.*, 77 F.3d at 1168. The IRS must indicate a "realistic expectation, rather than an idle hope that something might be discovered." *Wyatt*, 637 F.2d at 300–01 (quoting *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir.1968)); *David H. Tedder & Assocs.*, 77 F.3d at 1169. The IRS is not permitted to conduct a rambling "'fishing expedition' through a taxpayer's records." *United States v. Richards*, 631 F.2d 341, 345 (4th Cir.1980). To satisfy the relevance prong of *Powell*, the IRS need only show that the material requested is of potential, not actual, relevance. *See Arthur Young & Co.*, 465 U.S. at 814, 104 S.Ct. 1495; I.R.C. § 7602(a).

Potential rather than actual relevance is required because "the Service can hardly be expected to know whether such data will in fact be relevant until it is procured and scrutinized." *Arthur Young & Co.*, 465 U.S. at 814, 104 S.Ct. 1495. However, in this case, the IRS has not suggested that it must examine the source code to determine whether it is relevant to the audit issues. Rather, given the nature of the summonsed source code, relevance can be determined before production. The IRS cannot rely on the need to examine the source code as a basis to avoid or reduce the showing of relevance required.

The IRS, citing *United States v. Norwest Corp.*, 116 F.3d 1227, 1233 (8th Cir. 1997), argues that the relevance requirement can be satisfied even when the summonsed information is ultimately found to be "not fruitful." (Docket Entry No. 36, p. 15). "It is the Service that decides how, what, and why to audit, not the taxpayer." (*Id.*). The IRS's argument is overbroad if it leads a court to enforce a summons when there is no realistic expectation of finding information relevant to a taxpayer's return. *See, e.g., Matras*, 487 F.2d at 1275. To hold otherwise would be to eviscerate *Powell* and *Wyatt*. Indeed, the *Norwest* court based its holding on the finding that the IRS had "sufficiently shown that the material it seeks may assist the audit team in understanding the return and in focusing the investigation." 116 F.3d at 1234. The question is whether the IRS has made this showing as to the summonsed source code at issue here.

## B. The Source Code's Relevance to the Treatment of Maintenance Agreement Revenues

The IRS readily admits that the source code is irrelevant to its primary position in the 1993 audit. In the primary position, the IRS disregards the Cost Sharing Agreement between BMC and BV1 in calculating the value of the European distribution rights BV1 received. The IRS contends that the source code will allow it to refine the tax due under its alternative position, which did recognize the Cost Sharing Agreement. The IRS asserts that 1993 maintenance agreement revenues should be included in the royalty base, to the extent the value of the 1993 enhancements and improvements distributed was due to pre-April 1992 technology and not subject to cost sharing.

The IRS argues that "the summonsed information will assist the Service in determining ... how much old technology existed in the enhancements to products already in existence as of the date of the agreements between BMC and its controlled foreign affiliates." (Docket Entry No. 36, p. 17). The IRS wants to know the extent of the pre-April 1, 1992 technology contained in these enhancements as compared to the "new," post-April 1, 1992 technology. (Tr. 194). Because the "new" technology is subject to the Cost Sharing Agreement between BMC and its European affiliate and is excluded from the royalty base, the IRS asserts that knowing the extent of the "old" technology in the product enhancements will help in determining the "correct compensation due BMC from its controlled foreign affiliates, both as payment for the transfer of intangibles and as the buy-in required to cost share." (Docket Entry No. 36, p. 5).

BMC readily agrees that part of the value of the enhanced software products, such as updates, patches, and new releases, provided to European maintenance plan customers after April 1, 1992, is de-

rived from pre-April 1, 1992 technology. (Tr. 69–70). This "old" technology is not subject to the Cost Sharing Agreement. BMC vigorously disputes that counting the number of lines or changes in source code for the enhanced products will shed any light on the audit valuation issue.

Dr. Krasner proposed to the IRS that he compare the number of lines of source code for pre-April 1, 1992 products with the number of lines of source code in the 1993 enhancement products, by asking how many lines of code were added, how many were deleted, and how many remain the same. (Tr. 196). The IRS admits that all it hoped to learn from Dr. Krasner's "metric" comparison was the number of source code changes between the product as of April 1, 1992 and the 1993 product enhancements. In his deposition, Dr. Krasner told BMC that he did not consider any analysis, functional or otherwise, of the substance of the source code changes.

The IRS never explains how this mechanical, quantitative comparison of the number of source code lines or changes has any bearing on the determination of the value the enhancement product derives from pre-April 1, 1992 technology as opposed to "new," cost shared technology. The IRS never explains how comparing the number of source code lines or the number of source code changes will throw light on the task of "objectively measur[ing] the value of the rights transferred" by BMC to BV1. (Docket Entry No. 36, p. 5).

The IRS repeatedly concedes that, in calculating the royalty base, the critical task is to determine the market value of the "old technology" versus the "new technology" in the product enhancements pro-

vided to European maintenance agreement customers during the 1993 tax year.[8] (Tr. 234; Tr. II 61; Docket Entry No. 10, Ex. 1, Att. 5; Docket Entry No. 36, p. 5). Experts for both the IRS and BMC testifying at the show cause hearing agreed that the number of changes made in the source code of an enhanced software product has no bearing on the value of the changes made or the enhanced product that results. (Tr. 38, 204, Tr. II; 71). The value depends on the functionality and quality of the changes made to the product, in relation to other products available on the market. (Tr. 58–60; Tr. II 74–79). The number of changes in source code from a software product to its enhanced version does not provide any information on how much value is attributable to "old" technology as opposed to "new," cost-shared technology.

The substantive effects of the enhancements on the functionality, efficiency, and quality of a software product are described in documents BMC provides its customers to explain the changes, including reference manuals, user guides, and maintenance letters. BMC produced those documents to the IRS.[9] These materials do provide information on the qualitative effect of enhancements on the BMC products distributed, and with the market prices, provide information relevant to determining the value of those enhancements. In contrast, the number of changes in source code simply does not "throw light" on how much of the value of the enhanced products was due to product existing as of April 1, 1992 and how much was due to cost-shared technology added after that date.

The IRS Engineer on the audit team, William Johnson, reached a similar conclu-

---

8. Bruce Rhames, an IRS Group Manager, told John Cox of BMC in a letter that "[t]he source code is a tool for us to use in *valuing* the royalties you should have received and the sales price of software to your foreign subsidiaries." (Docket Entry No. 10, Ex. 1, Att. 5) (emphasis added). Dr. Krasner, the driving force behind the source code request assumed that he was hired to provide information for the IRS to use in measuring the costs of the

enhancements, not the value of the enhancements. (Tr. 201). Dr. Krasner's assumption reflects the lack of connection between the source code and the market value.

9. It is unclear whether Dr. Krasner saw these functional descriptions of the differences between products existing in April 1992 and enhanced versions of those products distributed in 1993.

sion about the usefulness of the source code. In a May 19, 1997 internal IRS memorandum, Johnson wrote:

> The lines of code and the percentage of reused code will provide information for the size of the programs and a number for the reused code. This will give a metric for the programs. *This will not give an idea as to the nature of the technology of the enhancements. One will not be able to determine the added technology and pre-existing technology with this metric.*
>
> . . . .
>
> The information requested by Herb Krasner will not yield data to disseminate and make a conclusion about the attributes or features of the maintenance versions of BMC.
>
> . . .
>
> . . . . I believe that Mr. Krasner needs to concentrate on the nature of the technology and not on metrics for software, such as the size of program or cost to develop.

(R.Ex. 37; Tr. II 13–15) (emphasis added).[10]

The IRS's claim of relevance is also inconsistent with the positions both it and BMC take in the audit. In its alternative position, the IRS concluded that *all* maintenance agreement revenues (aside from five percent attributed to telephone support rather than software enhancements) should be included in the royalty base. (R.Ex. 11, Tab J, Form 886–A, p. 3). The IRS based its position on the argument that BMC, "as the exclusive developer of the code corrections, enhancements and

modifications to the [s]oftware . . ., holds the copyright and therefore should receive royalties from the separate maintenance agreements." (*Id.*). BMC concluded that *none* of the fees should be included in the royalty base because all the 1993 maintenance agreement fees represented payment for new product technology, subject to the Cost Sharing Agreement. BMC based its conclusion on the fact that it distributed only new, cost-shared products to 1993 purchasers of maintenance agreements.

The IRS's position is that all maintenance revenues should be included in the royalty base; BMC's position is that none of the revenues should be included. Under either position, there is no need to learn the amount of pre-April 1, 1992 technology in the software modifications and enhancements. IRS international examiner Timothy Marion was unable to articulate a connection between source code and either BMC's or the IRS's alternative audit positions. (Tr. 247–52). The IRS economist, Dr. Balash, conceded that the question of "old technology versus new," to which the source code relates, simply has no bearing on the IRS's alternative audit position. (Tr. II 50). The IRS's own position, and BMC's response, both make source code wholly irrelevant.

## C. The Source Code's Relevance to the Treatment of the Royalty Rate

The IRS also asserts, as part of its alternative audit position, that BMC miscalculated the royalty rate for the years after 1993.[11] The IRS asserts that BMC understated the rate at which its pre-April

---

**10.** At the evidentiary hearing, Johnson testified that source code "will give you an indication of value." (Tr. II 13). He also claimed that source code would have been helpful to his own analysis. (Tr. II 24–25). However, his attempted explanation of why he changed his mind was not only unpersuasive, but incomprehensible. Johnson stated that source code "would have provided a direct measurement of what the program is doing and how important each function of the program was written to run and how much technology of that program—what sort of technology the

lines of code would indicate it would do when it's compiled and ran." (Tr. II 25).

**11.** The taxpayer, BMC, proposed that the royalty rate for 1993 should be thirty-five percent, with declines in subsequent years to 28%, 21%, 14%, 7%, and 5%. (R.Ex. 8, Amendment to License Agreement, ¶ 1.2). The IRS, relying on Dr. Balash's report, argued that the 1993 royalty rate should begin at forty-five percent, with declines in subsequent years to 42.75%, 36%, 27%, 18% and 9%.(R.Ex. 11, tab E, p. 38).

1992 technology decayed and therefore miscalculated the rate at which the percentage of royalty BV1 owed BMC declines over the life of the Cost Sharing Agreement. The parties agree that over time, a declining amount of BV1's revenues are attributable to pre-April 1, 1992 technology. The parties disagree on the speed of technology decay and the resulting decline in royalty rates. The IRS attempts to support its summons request by arguing that the source code will be helpful for a more accurate determination of the speed of technological decay.

This argument is flawed in several respects. For the 1993 tax year, the rate of future technological decay is simply irrelevant. Both BMC and the IRS agree that all 1993 license fee revenues were included in the royalty base. BMC assumed that no post-April 1, 1992 technology generated these revenues in 1993. (Tr. 116–17; Tr. II 44, 50). Dr. Balash's own report concluded that "revenue from completely cost shared intangibles will not accumulate until, on average, mid FY [Fiscal Year] 1995." (R.Ex. 11, tab E, p. 37). As Dr. Balash noted, "new products do not generate significant revenues for at least six months after introduction." (*Id.*). The only dispute for the 1993 tax year is the correct percentage of the royalty BV1 owes BMC in that year. The taxpayer, BMC, argues that the correct royalty rate is thirty-five percent. The IRS contends that the accurate rate is forty-five percent. Dr. Balash conceded that source code has no bearing at all on this issue. (Tr. II 44, 50).

At the show cause hearing, the IRS attempted to introduce a new theory to explain how the issue of the rate of technological decay, and the source code, relate back to the 1993 tax year. (Tr. 16–17; Tr.

II 58–59, 62). The Service argued that the royalty payments from BV1 to BMC must be examined from a five-year perspective, reflecting the five-year life of the transaction. The IRS argued that the 1993 royalty revenues should be characterized as the first installment in this five-year plan and that all five years must be examined to calculate the proper amount of this first installment. However, this new theory is inconsistent with the parties' shared position that all BMC's 1993 European license revenues were included in the royalty base. Dr. Balash conceded that the new theory would not affect any of the proposed adjustments in the 1993 audit. (Tr. II 44). The IRS has failed to demonstrate a connection between the source code and the rate of technological decay or between the rate of technological decay and the 1993 tax audit.

The IRS argues that it is nonetheless entitled to source code to examine the tax effects beyond 1993 because BMC "chose the form of the transaction" and because "the Service has opened an audit for subsequent years 1994 through 1996." (Docket Entry No. 36, p. 16). These contentions do not advance the IRS's position. The declaration of the lead revenue agent stated that the IRS summons is in furtherance of the investigation of BMC "for the fiscal year ending March 31, 1993." (Docket Entry No. 1, Ex. 2, ¶¶ 2–3). The source code simply has no relevance to BMC's tax liabilities for the 1993 fiscal year.[12]

The IRS has failed to explain how source code will "throw light" upon the determination of the "correct compensation due BMC from its foreign affiliates" for the 1993 tax year. This court finds the relevance issue dispositive and quashes the summons on that basis.[13]

---

12. The Fifth Circuit has held that "an IRS summons can require the production of records for years that are time-barred from investigation so long as the material from those years is relevant for the years under investigation that are not time-barred." *See Barquero v. United States*, 18 F.3d 1311, 1318 (5th Cir.1994). The present situation is analogous. An IRS summons may only be enforced as to material relevant for the year under investigation.

13. BMC asserts that because the rate of technological decay is used to value "old" technology, and because of the "disconnect" between source code and valuation, source code is also irrelevant for post–1993 audits. This court agrees that the technology decay argu-

## IV. BMC's Other Grounds for Challenging the Summons

### A. Abuse of Process

BMC invokes the Supreme Court's holding that an abuse of the summons process occurs "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58, 85 S.Ct. 248; *see also Wyatt*, 637 F.2d at 301.

This court notes that the circumstances and timing of the request for source code raise troubling questions. Dr. Krasner asked for BMC's source code. The principal members of the transfer pricing unit of the audit team did not ask for the source code or require it to complete their work. Indeed, Dr. Krasner did not appear until the transfer pricing unit was completing its work. Dr. Krasner had no substantive input into the reports that formed the foundation of the IRS position in the September 1996 NOPA. (Tr. 191, 238–39; Tr. II 7–8, 52–53). The positions taken by the IRS in the NOPA remain unchanged through the present day.

While Dr. Krasner asked for the source code, he admitted that he had a very limited understanding of the audit issues. (Tr. 201). Dr. Krasner stated that the IRS retained him to analyze the composition of the 1993 BMC product releases. (Tr. 201). He assumed that the purpose of his analysis was to help the IRS determine the costs of developing the new software, but he was never asked to assess the costs of enhancements himself. (Tr. 201–02, 214). Dr. Krasner undertook no substantive review of Dr. Balash's report, which formed

the basis for the IRS's section 482 adjustments. (Tr. 191). Other agents on the audit team brought to the IRS management's attention the absence of any connection between source code and the valuation issue in the audit. (R.Ex. 37; Tr. II 13–15). Dr. Krasner admitted that source code has no bearing on valuation. (Tr. 202–04). Yet Dr. Krasner never abandoned his pursuit of the BMC source code.

At the show cause hearing, Dr. Krasner testified that he could have completed his analysis using line-count information from BMC rather than counting the source code changes himself. (Tr. 221–22). In fact, Dr. Krasner called this approach "preferable." (Tr. 222). The IRS did not offer this option at any point during the prolonged dispute. Neither the IRS nor Dr. Krasner explained the insistence on obtaining source code when the information sought could be obtained without source code using a "preferable" approach.

BMC notes Dr. Krasner's admitted hostility to trade secret laws and the competitive advantage he could obtain by accessing BMC's trade secrets. (Docket Entry No. 34, p. 14; No. 19, p. 7). However, because this court has quashed the summons for lack of relevance, it does not now decide whether the questions raised by this record show "egregious misconduct" that would provide an independent basis for quashing the subpoena.

### B. "Any Appropriate Ground"

A taxpayer can challenge a summons not only by showing abuse of process or disproving a *Powell* factor, but also on "any appropriate ground." *United States v. Powell*, 379 U.S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). Four such grounds

ment does not support the relevance of source code to determining the proper rate to be applied to the royalty base in 1994 and later years. The government still has not explained the basis for its assertion that comparing the number of changes in source code from pre-April 1, 1992 products to enhancements of those products "throws light" on deciding the appropriate change in royalty rate in years after 1993. Dr. Balash completed his analy-

sis of technology life using averages rather than any source code or other comparison of "amounts" of old and new technology. Dr. Balash called his method the "preferable" approach. (Docket Entry No. 11, tab E, p. 37). Dr. Balash also admitted that the IRS and BMC already have such similar calculations regarding the rate of technology decay that the "adjustment based on this issue is small." (*Id.*, p. 38).

are raised in this case. BMC contends that (1) the summons is unduly burdensome, (2) the summons is inconsistent with the substantial countervailing policy of trade secret protection, (3) the summons is overbroad, and (4) the enforcement of the summons would infringe on BMC's Fifth Amendment rights. This court briefly examines each of these grounds.

### 1. Unduly Burdensome

A court may quash a summons if the information requested is "so burdensome *to produce* that enforcement should be denied." *United States v. Humble Oil & Ref. Co.*, 488 F.2d 953, 959–60 (5th Cir. 1974) (emphasis added), *vacated on other grounds*, 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975); *see also Wyatt,* 637 F.2d at 302 n. 16. In its post-hearing brief, BMC argues that the summons was unduly burdensome because of the inevitable harm that would occur if its trade secrets were exposed. BMC folds its claims of harm from trade secret exposure into its "unduly burdensome" argument.[14] Harm to proprietary assets is a harm distinct from the burdensomeness addressed in *Humble Oil.* "Unduly burdensome" refers to the "imposition of an unreasonable and excessive financial burden" in producing the summonsed information. *United States v. Dauphin Deposit Trust Co.*, 385 F.2d 129, 130 (3rd Cir.1967). Burden-

someness is closely related to "over-breadth"; an overbroad summons may lead to an unreasonable financial burden on the taxpayer. *See Humble Oil,* 488 F.2d at 959–60; *but see Wyatt,* 637 F.2d at 302 n. 16 (burdensome is "distinct concept").

■ Betty Otter–Nickerson, a BMC vice-president, conceded that BMC has located much of the source code still in existence and that retrieving it would take little additional time. (Tr. 42–47). The IRS admits that it cannot summon information that is no longer available or that would have to be manufactured. The summons may not be quashed on the ground of burdensomeness.

### 2. A Substantial Countervailing Policy of Trade Secret Protection

In *United States v. Euge,* 444 U.S. 707, 711, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980), the Supreme Court held that "if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies." BMC seizes on the last phrase, arguing that the congressionally-created legal regime protecting intellectual property rights constitutes a "substantial countervailing policy."[15]

---

**14.** BMC cites *Dow Chem. Co. v. Allen,* 672 F.2d 1262 (7th Cir.1982), for the proposition that undue burden exists when "the risk of harm from disclosure of information may exceed the need for information by so great a margin that disclosure, in and of itself, is an undue burden." (Docket Entry No. 34, p. 22). However, the issue in *Dow Chemical* was the enforceability of an administrative subpoena issued by the Environmental Protection Agency to University of Wisconsin researchers at the request of a chemical manufacturing company. In resolving the dispute, the *Dow Chemical* court balanced the need for the requested information and its probative value against the burden of compliance. No such balancing of interests is called for in the context of an IRS summons. Relevance of the requested material is a separate inquiry under a separate legal standard. The concept of "unduly burdensome" reflects only

difficulties associated with production of the requested items.

**15.** The importance of keeping source code confidential and the risks of disclosure to competitors are well established. Congress has passed a law denying the IRS access to tax-related computer software source code, unless it makes a specific request for the code, demonstrates the need for such code, and demonstrates that its needs outweigh the risk of unauthorized disclosure of trade secrets. Even if the IRS does satisfy these requirements, it must comply with extensive safeguards to ensure protection of trade secrets and confidential information. *See* Internal Revenue Service Restructuring and Reform Act of 1998, Pub.L. No. 105–206, 112 Stat. 685, 751–53 (codified as amended at 26 U.S.C. § 7612). The computer source code at issue is not for tax preparation software and does not fall within the statute. However, the

BMC points to no cases in which a court has quashed an IRS summons based on a countervailing policy. A number of courts have recognized the exception but refused to quash a summons on that basis. *See, e.g., United States v. El Paso Co.*, 682 F.2d 530, 544–45 (5th Cir.1982) (the summons did not conflict with the policies of the federal securities laws; court will not restrict summons power "[i]n the absence of a more profound clash between congressional policies"); *PAA Management, Ltd. v. United States*, 962 F.2d 212, 218 (2d Cir.1992) (collateral proceedings in the Tax Court did not create substantial countervailing policies that would justify quashing a summons); *St. German of Alaska Eastern Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1092 (2d Cir.1988) ("a constitutional challenge to an IRS summons may raise a 'substantial countervailing policy' sufficient" to quash a summons but did not in that case); *United States v. White*, 853 F.2d 107, 117 (2d Cir.1988) (federalism and comity did not constitute a "substantial countervailing policy").

In *United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir.1982), the Second Circuit quashed a summons based on its finding that an accountant's work-product privilege constituted a substantial countervailing policy. In reversing this decision, the Supreme Court circumscribed · the "substantial countervailing policy" exception. It held:

> We are unable to discern the sort of "unambiguous directions from Congress" that would justify a judicially cre-

ated work-product immunity for tax accrual workpapers summoned under §. 7602. Indeed the very language of § 7602 reflects precisely the opposite: a congressional policy choice in favor of disclosure of all information relevant to a legitimate IRS inquiry. In light of this explicit statement by the Legislative Branch, courts should be chary in recognizing exceptions to the broad summons authority of the IRS or in fashioning new privileges that would curtail disclosure under § 7602. . . . If the broad latitude granted to the IRS by § 7602 is to be circumscribed, that is a choice for Congress, and not this Court, to make.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 816–17, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (citations omitted).

No court has held that trade secret laws could limit the IRS's summons power. The Eighth Circuit has come to the opposite conclusion. In *United States v. Norwest*, 116 F.3d 1227 (8th Cir.1997), the IRS sought to enforce a summons that directed a bank holding corporation to produce its tax preparation software, which had been licensed to it by Arthur Andersen. The taxpayer and Arthur Andersen argued that because the summons would require the taxpayer to copy and produce Arthur Andersen's copyrighted software, the summons was in conflict with the Copyright Act and should not be enforced. Finding "no authority for this proposition," the court held that a software copyright does not insulate a taxpayer or the copyright holder from an enforcement of a summons.[16] *Id.* at 1234.

---

statute reflects congressional acknowledgment of the risks disclosure of source code presents to the taxpayer. The Senate Report reads: "The Committee believes that the intellectual property rights of the developers and owners of computer programs should be respected. The Committee is concerned that the examination of computer programs and source code by the IRS could lead to the diminution of those rights through the inadvertent disclosure of trade secrets and believes that special protection against such inadvertent disclosure should be established. The Committee also believes that the indiscriminate examination of computer source code by the IRS is inappropriate." S.Rep. No.

105–174 (1998), *available in* 1998 WL 197371, at *171–72.

**16.** The court did take into account Arthur Andersen's significant proprietary interests in the software, noting that such interests would be protected by the conditions imposed on the IRS by the district court. *See Norwest*, 116 F.3d at 1234 & n. 9. The district court required the IRS to "identify those agents to whom [the software] would be provided, notify the court of any additional persons who would receive the program, use the program only in connection with the audit, and return all copies of the program and destroy any documents or notes related to the program

The record identifies the risks to BMC in producing its source code to the IRS and its outside consultant. The commercial importance of protecting the secret nature of the source code is reflected in the many steps that BMC takes to limit access to it. BMC worries that disclosure of its trade secrets to a third party "could destroy the competitive value of BMC's trade secrets and result in the loss of investments made by BMC in developing and acquiring its software." (Docket Entry No. 9, p. 22). This concern is amplified by the difficulty of discovering when another party has misappropriated trade secrets. (Tr. 77). BMC's fear is increased by Dr. Krasner's role and his admission that he hires subcontractors, some of whom work for competing software companies.[17] (Tr. 223).

▆▆▆ The Fifth Circuit has held that a district court is barred from placing conditions on the enforcement of a summons. *See United States v. Barrett*, 837 F.2d 1341, 1351 (5th Cir.1988) (en banc). Courts rarely quash a summons on the basis of a substantial countervailing policy. No court has found trade secret protection to fall within the "substantial countervailing policy" exception. The present record does not sufficiently support its application here.

### 3. Overbreadth

The Fifth Circuit has held that a summons may not be enforced if it is overbroad. *See United States v. Wyatt*, 637 F.2d 293, 301–02 (5th Cir.1981). "An overbreadth summons then is simply a summons which does not advise the summoned party what is required of him with sufficient specificity to permit him to respond adequately to the summons." *Id.* at 302 n. 16; *see also Barquero v. United States*, 18

F.3d 1311, 1318 (5th Cir.1994); *United States v. Linsteadt*, 724 F.2d 480, 483 (5th Cir.1984).

▆▆▆ BMC's overbreadth argument relies on its claim that enforcement of the summons "is totally unnecessary to accomplish the ends sought." (Docket Entry No. 34, p. 23). To the extent BMC argues overbreadth as a lack of relevance, this court has already addressed its contention. To the extent BMC argues overbreadth as a lack of specificity and definiteness distinct from relevance, as the Fifth Circuit instructs, this court disagrees. *See Barquero*, 18 F.3d at 1318; *Wyatt*, 637 F.2d at 301–02. A summons is overbroad when it fails to put the taxpayer on sufficient notice of the request. The IRS described the requested material with sufficient particularity, describing the information sought by version, release, and modification/maintenance number. The summons may not be quashed on this basis.

### 4. The Fifth Amendment

BMC asserts that "[c]ompelled disclosure of trade secrets to the Government without adequate protections, and without just compensation, violates the Fifth Amendment to the United States Constitution." (Docket Entry No. 9, p. 24). This claim is not ripe, because no disclosure has occurred. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). "Equitable relief is not available to enjoin an alleged taking of private property for public use ... when a suit for compensation can be brought against the sovereign subsequent to the taking.... The Fifth Amendment does not require that compen-

---

upon the audit's completion." *Id.* at 1234 n. 9.

17. Outside consultants hired by BMC do occasionally have access to source code. BMC contends that the danger posed by exposing the source code to the IRS and Dr. Krasner is much greater than the danger posed by these

outside consultants, for several reasons. BMC screens the outside consultants and has regular and continuous relationships with them. The economic interests of these consultants are generally aligned with the interests of BMC. Finally, their access is restricted to a "need-to-know" basis. (Tr.98).

sation precede the taking." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (footnote omitted) (citations omitted). Even assuming, without deciding, that compelled disclosure of the source code would amount to a taking, the Fifth Amendment does not appear to provide a basis for quashing the summons.

## C. Books, Papers, Records, or Other Data

BMC argues that source code is not a "book[ ], paper[ ], record[ ] or other data" within the meaning of I.R.C. § 7602(a) and is therefore beyond the scope of IRS's summons authority. This claim requires this court to determine whether computer source code is a form of information that the IRS may summons.

Only two courts have addressed the question of whether computer source code is a "book[ ], paper, record or other data" within the meaning of I.R.C. § 7602(a). In *Norwest,* 116 F.3d at 1227, the IRS sought to enforce a summons that directed the taxpayer, Norwest Corporation, to produce its tax preparation software, which it had licensed from Arthur Andersen. Norwest and Arthur Andersen sought to quash the summons, arguing that the software was not a "record" or "other data" because the "program itself d[id] not contain or save any financial information particular to Norwest." *Id.* at 1232. Norwest and Arthur Andersen likened the software to a calculator. The court disagreed, stating: "In light of the broad effect we are to give section 7602, a coded set of algorithms that sorts and arranges a taxpayer's financial information and then uses that information to generate the audited return can certainly be considered a 'record' or 'other data.'" *Id.*

The court in *United States v. Caltex Petroleum Corp.,* 12 F.Supp.2d 545 (N.D.Tex.1998), arrived at the same conclusion. In *Caltex,* the IRS sought the source code for tax preparation software used to calculate the taxpayer's foreign tax credits. The software manufacturer, Computer Language Research, Inc. ("CLR"), joined the taxpayer in challenging the summons. CLR argued that the source code was not a "record" or "other data" subject to IRS summons because: (1) the program itself did not contain or save any financial information particular to the taxpayer; and (2) the source code is a "proprietary asset used to create software products licensed by the company." *Id.* at 552. The *Caltex* court relied on *Norwest* to defeat the first rationale, holding: "If Caltex had not used a computer program to make those choices and perform those calculations, that information would have been reflected in its own work papers or records. Caltex has, in effect, adopted the computations made by the computer program." *Id.* The court found the second ground unpersuasive as well, holding that source code could be both a proprietary asset and a "record" within the terms of the statute. It further noted that "the tax code places no conditions on access based on the form in which the record is maintained." *Id.* at 553.

BMC seeks to distinguish these cases on the ground that the computer source code at issue here was not "used in preparing financial records or tax returns, nor does it substitute therefor." (Docket Entry No. 9, p. 15). The *Norwest* and *Caltex* courts found the tax preparation source code to be both a proprietary asset and a tax "record." BMC's source code is a proprietary asset, but not a tax record. BMC interprets the IRS's summons authority as extending only to materials containing financial data. BMC offers a principled distinction between this case and the facts in *Norwest* and *Caltex.* However, BMC does not address why, in a case turning on transfer pricing issues, the IRS lacks statutory authority to obtain materials relevant to the value of the transfers at issue, even if the materials transferred involve computer source code. BMC offers no case law supporting this application of section 7602. BMC argues that even if software source code was relevant to the transfer pricing issues of the software distribution rights, and the other *Powell* factors were met, the form of the information

could alone preclude production. This position, resting on a narrow definition of "record," is inconsistent with the Supreme Court's consistently liberal construction of the IRS summons power.

The Supreme Court has stated that the IRS has "a broad mandate to investigate and audit 'persons who may be liable' for taxes," and that courts must be careful "not to restrict that authority so as to undermine the efficacy of the federal tax system." *United States v. Bisceglia,* 420 U.S. 141, 145, 146, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975). In *United States v. Euge,* 444 U.S. 707, 715–16, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980), the Supreme Court held that the IRS could compel handwriting exemplars, broadly interpreting section 7602 so as not to be restricted to financial items. The Court noted that "[t]here is ... a formidable line of precedent construing congressional intent to uphold the claimed enforcement authority of the Service if such authority is necessary for the effective enforcement of the revenue laws and is not undercut by contrary legislative purposes." *Id.*

Congress recently enacted legislation restricting the IRS's access to computer source code for tax preparation software. *See* I.R.C. § 7612. This legislation applies only to tax preparation software intended for commercial use; it does not apply to the source code at issue here. Congress referred to the existing law as having "no specific statutory restrictions on the ability of the Secretary to demand the production of computer records, programs, code, or similar materials." H.R.REP. No. 105–364(I), pt. 4 (1997), *available in* 1997 WL 689805.

The courts have consistently applied section 7602(a) broadly. In *United States v. Schenk,* 581 F.Supp. 218 (S.D.Ind.1984), a court ordered the taxpayers to produce a copy of a videotape, the fair market value of which was in dispute in the audit. The taxpayers had claimed income tax deduc-

tions and tax credits with respect to its investment in the videotape. They protested the summons, arguing that the "video tape is not a record per se, but rather the investment asset itself." *Id.* at 221. Nevertheless, the court had "no hesitance" in enforcing the summons. *Id.* BMC points out that the videotape was at the center of the audit dispute, while the source code is not. BMC's argument is that source code is not relevant to the valuation dispute. That is a different question from whether source code is a form of information subject to summons.

In *United States v. Davey,* 543 F.2d 996 (2d Cir.1976), the Second Circuit compelled production of computer tapes that comprised part of the corporate taxpayer's financial record-keeping system. While these tapes were forms of financial records, the court used broad language to describe the summons power. Rejecting the argument that section 7602 is "limited to visible and legible records," the court held:

> Section 7602 is intended to allow the IRS access to all relevant or material records and data in the taxpayer's possession. It places no limit or condition on the type or form of the medium by which the record subject to summons is kept and nothing in the language or background of the section suggests that such a limitation was intended. The purpose was to enable the IRS to get at the taxpayer's records, in whatever form they might be kept. The standard is not the form of the record but whether it might shed light on the accuracy of the taxpayer's return....
>
> ....
>
> We therefore hold that the language of § 7602 is sufficiently broad to encompass records or data stored in the form of computer tapes.

*Id.* at 999.[18]

■■ This court finds that it cannot quash the summons on the ground that the

---

**18.** BMC also points to *Becker v. United States,* 451 U.S. 1306, 101 S.Ct. 3161, 68 L.Ed.2d 828 (1981) and *United States v. Brown,* 536

F.2d 117 (6th Cir.1976) to support a narrower interpretation of section 7602. The *Brown*

computer source code at issue is not "other data" within the meaning of section 7602.

## V. Conclusion

This court DENIES the IRS's motion to enforce the summons and GRANTS Cox's motion to quash the summons, based on the source code's lack of relevance to the 1993 tax audit.

court did argue for a narrow construction of section 7602. However, its conclusion that handwriting exemplars were beyond the scope of section 7602 was overturned by the Supreme Court in *Euge.* In *Becker,* the court temporarily stayed enforcement of an IRS summons for videotapes as to which the taxpayer had claimed tax credits and deductions. The court issued the stay because it questioned whether the IRS could summons assets other than financial records. However, the precedential value of this decision is minimal, as the *Caltex* court observed. *See Caltex,* 12 F.Supp.2d at 552 n. 13. The stay was a temporary measure designed to preserve the *status quo,* accompanied by an admission that the issuing court was "by no means convinced of the correctness of the position of either party." *Becker,* 451 U.S. at 1310, 101 S.Ct. 3161. The court subsequently vacated the temporary stay. *See Becker v. United States,* 452 U.S. 935, 101 S.Ct. 3073, 69 L.Ed.2d 949 (1981).